OPINION OF THE COURT
Rivera, J.
We are presented in this appeal with a confluence of prosecu *771 torial misconduct committed during closing argument, and a series of critical lapses by defense counsel when faced with the prosecutor’s obvious transgressions from the leeway generally afforded attorneys during summation. As the record establishes, defense counsel failed to object, time and again, when the prosecutor repeatedly misrepresented to the jury critical DNA evidence as proof of defendant’s guilt, in contradiction of the People’s expert testimony. We conclude defense counsel was ineffective, and, on the record before us, defendant was denied a fair trial as a result. Therefore, the order of the Appellate Division should be reversed.
L
Defendant Howard Wright was tried and convicted of murder in the second degree. The People’s case was circumstantial because there were no eyewitnesses to the crime and no forensic evidence that clearly established defendant’s guilt. Other than testimony that placed defendant and others in the victim’s company around the time of her death, and defendant’s statement that he engaged in consensual sex with the victim, the People had no evidence that linked her to defendant. To meet the People’s burden of proof, the prosecutor relied heavily on the results of DNA testing to connect defendant to the murder. However, the DNA analysis was also circumstantial because it did not “match” defendant’s DNA to the DNA collected at the crime scene. Instead, the test only indicated that defendant could not be excluded from the pool of male DNA contributors, and the expert testimony provided no statistical comparison to measure the significance of those results.
Notwithstanding the known limitations of this DNA evidence and the indeterminate conclusions about the test results drawn by the People’s own experts, the prosecutor in summation misrepresented the DNA analysis, including arguing the evidence established that defendant’s DNA was at the crime scene and on a critical piece of evidence linked to the victim’s murder. In light of the powerful influence of DNA evidence on juries, the opportunity for juror confusion regarding the limited probative value of the DNA methodology employed in this case, and the qualified nature of the test results, defense counsel’s failure to object rendered him ineffective.
To understand the nature of the prosecutor’s actions and the lack of any reasonable strategy for leaving the prosecutor’s statements unchallenged, we begin our consideration of de *772 fendant’s appeal with a review of the relevant trial evidence and the prosecutor’s closing argument. Our legal analysis then focuses on the details of the summation and defense counsel’s unexplained silence.
IL
A. Testimony Connecting Defendant to the Victim
Defendant was tried in 2007 for the murder of the victim, a female drug user, who was found dead on a Rochester street on November 29, 1995. Defendant had been seen in the victim’s company, in the hours before her murder, in the vicinity of a building associated with drug use.
According to a witness who knew defendant and had seen the victim “around” on prior occasions, she observed the victim in a car with three men, whom she identified as defendant, Christopher Gifford, and Keith Evans, between 8:00 and 9:00 p.m. on November 28, 1995. She saw the car pull up to a building on North Clinton Avenue and drive away after Evans exited the car. She then saw defendant and Gifford the following morning, between 5:00 and 6:00 a.m., as they exited through the back of the same building. This time she did not see the victim. Shortly after defendant walked out, she saw the victim’s car pull out from the back of the building and drive past. Although she testified she did not see who was in the car, she assumed that it was defendant and Gifford because they were the only persons who exited through the back of the building to where she had observed the car was parked.
Evans testified and confirmed that he had been with the victim and defendant around the time of the murder. Evans, a drug dealer at the time, was a regular associate of defendant, and also knew the victim. He testified that, on November 28, he went to a building on Chamberlain Avenue, to sell cocaine. He found the victim with her baby, defendant, Gifford, and two other individuals, identified as brothers Freddy and Christopher Walker, in one of the apartments. He claimed that defendant and Gifford had sold drugs to the victim that day. At some point the victim left in her car and, between 4:00 and 5:00 p.m., returned without the baby. She again left the apartment, this time with Freddy, returning 45 to 60 minutes later. Between 5:00 and 7:30 p.m., the victim drove Evans, defendant, and Gifford to a tavern, where she and Evans spent approximately 15 minutes inside the tavern before she drove to the North Clinton Avenue building and dropped off Evans, *773 somewhere between 7:30 and 8:00 p.m. She then drove off with defendant and Gifford.
Evans further testified that, over the course of the next several hours, he saw defendant and Gifford together, but without the victim. Evans claimed that between 11:00 and 11:45 p.m. he was outside on the street near the North Clinton Avenue building, on his way to make a telephone call to the police on an unrelated matter, when he saw defendant and Gifford walking by.[1] Evans also testified that he saw the victim’s car in the alley next to the building where he had just seen defendant and Gifford.
Around 2:00 a.m., on November 29, he saw defendant and Gifford drive past in the car. Evans next saw defendant and Gifford a few hours later, between 4:00 and 5:00 a.m., when he went inside one of the apartments in the North Clinton Avenue building looking for them believing they had taken his food. He found them sleeping in the apartment, and, after he woke them up, they exited the building and drove away in the victim’s car.
Evans testified that he saw defendant a few days after he saw a newspaper reference to the victim. As they walked on the street defendant pointed out the victim’s car, which was parked where the police subsequently found it. When Evans asked defendant about the victim, defendant told Evans that he and Gifford engaged in sex with her. Afterwards, defendant and Gifford dropped her off, and then Gifford dropped off defendant. Later Gifford told defendant where he left the victim’s car. Evans described the location where the victim was dropped off as where “people that were doing the same thing they were doing.” On cross-examination, Evans suggested that she had been left with others who were “strung out on drugs.”
B. Discovery and Examination of the Victim’s Body and Car
At approximately 9:00 a.m. on November 29, 1995, the victim was found lying in the driveway of a house, clothed but barefoot, with her hands bound by a shoelace behind her back, and with a shoelace tied around her neck as a ligature. A sock was found inside her clothing near her buttocks.
The police found the victim’s car on November 30, 1995, near North Clinton Avenue, and discovered a pink sock inside, along with various baby items. The victim’s hairs were found in the *774 car as well as hair samples from both white and black individuals.
The medical examiner testified that the victim died as a result of asphyxia from ligature strangulation, with the approximate time of death between 11:30 p.m., on November 28, and 3:30 a.m the day she was discovered. The body had abrasions under the chin and around the neck. The medical examiner also found two dark-colored hairs near the victim’s external genitalia, later identified not to be the victim’s.
Various physical evidence, including the hand and neck shoelace ligatures, vaginal swabs taken from the victim, a sperm sample taken on her panties, the two hairs, and an additional hair from the victim’s mouth, was sent to an independent laboratory for further analysis. The results of the analysis were presented at trial through expert testimony.
C. Forensic and DNA Evidence
The People presented testimony of three forensic experts to discuss the DNA evidence collected during the police investigation. The evidence included samples from the crime scene and the victim, and buccal swabs from the victim’s husband, defendant, Evans, Gifford, and Christopher and Fred Walker.
One expert from the Monroe County Public Safety Laboratory explained DNA and DNA profiles, how DNA profiles are developed, and how DNA testing and analysis are used to compare an individual’s DNA profile with the DNA profile of evidence obtained at a crime scene. She explained that because less than one percent of human DNA is different, DNA analysis looks at specific regions of DNA to identify where the DNA is different between individuals. In order to make comparisons, the analyst studies the different locations on DNA profiles to determine if the individual is a possible donor to the DNA from the crime scene. If there are differences on the locations, then the individual is excluded from the possible contributors to the DNA.
She testified that in 1995 when she was an Assistant Forensic Chemist for Monroe County, she examined swabs taken from the victim, which contained semen and sperm. Then in 2006, in her position as a Forensic Biologist, she examined ligatures from the victim’s hands and neck. The DNA profile from the neck ligature only matched the victim. The DNA from the hand ligature was so low-level that she did not report that data. Instead, she sent the swabs from the ligatures to a *775 private laboratory for additional testing, specifically Y chromosome or YSTR DNA testing, and mitochondrial DNA testing. She also sent hairs collected from the victim’s body, DNA extracts from the vaginal swab and the victim’s panties, and the DNA samples from the victim, her husband, Evans, and the Walker brothers.
On cross-examination, the expert testified that the DNA profiles from the hand and neck ligatures were mixtures of at least two contributors, but that the DNA was of such a low level, meaning that there was a small amount of DNA or that it was degraded, that she was unable to report back any comparisons. Given the quality of the DNA, she could not state whether there were more than two contributors. She further explained the term “transference” as the process by which DNA transfers from one object to another, or from one person to an object.
She explained that a “match” results when the profiles are the same at all the locations tested on the DNA, after comparing the DNA crime scene profiles to an individual’s DNA profile. In contrast, the term “not excluded” is applied to mixtures of DNA. She clarified that when the result establishes that an individual is “not excluded” this means “the data is of such quality that it is not strong enough to say it matches a particular person, but yet the data is also such that you cannot say that it is not them in that [DNA].”
A second expert, the Assistant Lab Director and DNA Technical Manager for the Monroe County Public Safety Laboratory, testified that in 2002, and again in 2006, she performed a differential DNA extraction on the vaginal swab and semen stain from the victim’s panties. Differential extraction is a method by which DNA is drawn from the biological material, and DNA from sperm cells is separated from the DNA in non-sperm cells. According to her test results, the sperm fraction on the vaginal swab contained a DNA mixture of at least two contributors, of which Gifford could not be excluded as a contributor, but the victim’s husband, Evans, and the Walker brothers were excluded.
The test also indicated that the semen stain from the panties contained a DNA mixture of at least four contributors, of which the victim, her husband, and Gifford could not be excluded, but Evans and the Walker brothers were excluded. She also testified that her examination of certain vaginal slides from the *776 victim’s autopsy indicated recent sexual contact. The expert provided no testimony regarding defendant because she did not analyze his DNA, but rather sent his sample to the independent laboratory for further DNA testing.
The third forensic expert was from the independent laboratory that conducted the YSTR DNA tests on the swabs and physical material sent from the Monroe County laboratory. She described YSTR DNA testing, explaining that it is used to isolate male DNA from male/female DNA mixtures. The expert testified that she compared the male DNA samples provided by Monroe County with the samples from the victim and her husband, defendant, Gifford, Evans, and the Walker brothers. The purpose of these tests was to show whether any of the men’s DNA characteristics matched characteristics of the crime scene DNA. If there was a match, she could not exclude the male from the pool of contributors with the DNA characteristics identified through the YSTR DNA test. She explained that YSTR DNA testing is distinct from autosomal DNA testing, which permits a statistical determination that an individual’s DNA matches the crime scene DNA, rather than a finding that someone cannot be excluded from the pool of possible contributors, who have some of the same DNA characteristics found on the victim DNA samples.
The expert testified that based on the results of the YSTR DNA analysis she could not exclude defendant and the victim’s husband as contributors to the hand ligature sample; that the analysis of the vaginal swab could not exclude defendant or Gifford as contributors; and that the victim’s husband, Gifford, and defendant could not be excluded as contributors to the sample taken from the panties. She also testified that the mitochondrial DNA testing of a black hair sample, recovered from the victim’s genitalia, matched the mitochondrial sequence of the victim and Gifford.
On cross-examination, the expert admitted that there was no statistical calculation drawn from the YSTR DNA testing, as can be done with autosomal DNA analysis, the more commonly familiar DNA testing.[2] She explained there is simply no single profile in YSTR DNA testing, as there is in autosomal DNA analysis. Instead, YSTR DNA analyzes a mixture of more than *777 one DNA profile. Asked specifically if she could quantify how many men other than the defendant, in the Rochester area or the trial courtroom, had the same combination of DNA characteristics indicated on the hand ligature, the expert said she could not. She testified that she could only provide information based on persons for whom she had samples. Again, asked specifically by defense counsel, “can you tell us with a reasonable degree of scientific certainty that [defendant’s] DNA is present on this hand ligature sample that you tested,” she responded “No, I cannot. All I can say is I can’t exclude him.”
D. Closing Arguments
During summation both the defense and the prosecution presented their respective views of the witnesses’ testimony, and what it revealed about the timeline leading up to, and following, the victim’s death. For her part, the prosecutor relied heavily on the DNA evidence, and argued that the DNA established that defendant raped and murdered the victim. She told the jury that the case could be decided based on “common sense and science.” She said that defendant and Gifford “left their DNA all over the crime” then turned her focus to what she argued was the one constant of the DNA analysis: that defendant was the only matching contributor across several DNA samples.
In the course of summation, she described the DNA evidence as narrowing the number of contributors. She stated that there were “two contributors and two contributors only, and the sperm fraction of the vaginal swab matched the YSTR/DNA profile of the Defendant and . . . Gifford.” She also stated that there were “[t]wo contributors to the sperm found in [the victim’s] vagina after she was tied up, the Defendant and his accomplice, . . . Gifford.” She also stated that the DNA is a mixture that cannot provide a statistical calculation, and she stated repeatedly that defendant “could not be excluded as a contributor to the mixture.”
In addition the prosecutor stated,
“The ligature on the hands, every single number that they were able to determine, and they were able to detect partial profile matches, is that of Howard Wright and [the victim’s husband]....
“[W]e have no reasonable explanation for Howard Wright’s DNA on that ligature that bound her hands. . . .
*778 “We have [defendant’s] sperm in [the victim’s] vagina. We have [defendant’s] sperm on [the victim’s] underwear, and we have [defendant’s] DNA profile included on the ligature that bound her hands together, the same identical ligature that is around her neck and strangled her to death.”
She argued that of the YSTR DNA profiles tested, defendant was the singular match to one of the most incriminating pieces of evidence, the ligature. “[T]he only one that matches of the people that she was with that night, the only one who matches the DNA profile on the ligature is [defendant].”
E. Defendant’s Conviction and Appeal
The jury found defendant guilty of second-degree intentional murder (Penal Law § 125.25 [1]) and acquitted him of felony murder (Penal Law § 125.25 [3]) and rape (Penal Law § 130.35). The court sentenced defendant to a term of 25 years to life.
In a 3-2 decision, the Appellate Division affirmed, with the majority rejecting defendant’s claims that the evidence was legally insufficient and against the weight of the evidence. The Court also concluded that defendant was not denied meaningful representation, and that his prosecutorial misconduct claim was unpreserved (115 AD3d 1257 [2014]).
The two dissenters would have exercised the Court’s interest-of-justice jurisdiction to review defendant’s claim of prosecutorial misconduct committed during summation, and would have reversed on that ground. They further would have reversed on ineffective assistance of counsel grounds because
“counsel’s failure to object to the prosecutor’s baseless transformation of evidence that defendant was in a group or class of people that could have contributed to the subject DNA samples to evidence that defendant was the sole possible contributor to those samples was so egregious and prejudicial that defendant did not receive a fair trial” (id. at 1262).
A Justice of the Appellate Division granted leave to appeal (22 NY3d 1204 [2014]). We now reverse.
III.
Defendant claims that his defense counsel was ineffective because of various alleged errors committed by his attorney *779 during the course of the trial.[3] We agree with defendant only as to some of the errors alleged. On this record, we conclude that defense counsel’s serial failure to object to the prosecution’s inaccurate and misleading descriptions of the DNA evidence during the People’s closing constitutes a pattern of inexcusable mistakes that cannot be attributed to a failed trial strategy, and which denied defendant a fair trial.
Every defendant is constitutionally entitled to effective assistance of counsel, meaning under our state standards that “[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met” (People v Baldi, 54 NY2d 137, 147 [1981], citing People v Droz, 39 NY2d 457 [1976]). Where a defendant claims that counsel’s performance is deficient the defendant must “ ‘demonstrate the absence of strategic or other legitimate explanations’ for counsel’s alleged shortcomings” (People v Benevento, 91 NY2d 708, 712 [1998], citing People v Rivera, 71 NY2d 705, 709 [1988], and comparing People v Flores, 84 NY2d 184 [1994] with People v Bennett, 29 NY2d 462, 465 [1972]; People v Droz, 39 NY2d at 463; People v Gonzalez, 47 NY2d 606, 611 [1979]).
The standard is challenging, but not insurmountable. Even where counsel’s errors “individually may not constitute ineffective assistance, ‘the cumulative effect of [defense] counsel’s actions [can] deprive[ ] defendant of meaningful representation’ ” (People v Oathout, 21 NY3d 127, 132 [2013], citing People v Arnold, 85 AD3d 1330, 1334 [3d Dept 2011]). The task of a reviewing court is to “[c]onsider[ ] the seriousness of the errors in their totality” (id. at 132). Moreover, as we have recognized, although “the inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case” (Benevento, 91 NY2d at 714).
An ineffective assistance claim based on defense counsel’s failure to challenge a prosecutor’s summation presents a unique set of considerations given the nature of closing statements generally. However, prosecutorial misconduct is not im *780 mune to attack by defense counsel merely because it occurs during the course of summation. As the Court has recognized,
“although counsel is to be afforded ‘the widest latitude by way of comment, denunciation or appeal in advocating [counsel’s] cause’ (Williams[v Brooklyn El. R.R. Co., 126 NY 96, 103 (1891)]) summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his command. There are certain well-defined limits” (People v Ashwal, 39 NY2d 105, 109 [1976]).
Summation must remain within
“the four corners of the evidence and avoid irrelevant comments which have no bearing on any legitimate issue in the case. Thus the District Attorney may not refer to matters not in evidence or call upon the jury to draw conclusions which are not fairly inferrable from the evidence” (id. at 109-110 [citations and internal quotation marks omitted]).
Defense counsel’s inaction in the face of prosecutorial misconduct made during closing argument is subject to the same “meaningful representation” standard applicable to other trial errors. Under that standard, where defense counsel fails to object when faced with a pattern of prosecutorial misstatements far afield from acceptable argument, such as statements that misrepresent evidence central to the determination of guilt, and where there is no apparent strategic explanation for defense counsel’s silence, defendant has been deprived of meaningful representation and the constitutional right to a fair trial.
IV
Here, defense counsel failed to object when the prosecutor misrepresented the scientific import of the DNA evidence, suggested that the evidence directly linked defendant to the murder although it did not, and made statements that contradicted the expert testimony about the limitations of YSTR DNA analysis. Given the significance of the DNA evidence, defense counsel’s silence is inexplicable, and under the circumstances of this case, his inaction was error.
During summation the prosecutor returned to the theme she had promoted during her opening, that this case was about “common sense and science.” While some amount of hyperbole *781 is not unusual, she exceeded “the four corners of the evidence” when she stated that defendant and his accomplice “left their DNA all over the crime.” In fact, the YSTR DNA analysis in this case did not result in a “match” between defendant’s DNA and the DNA found at the scene. According to the People’s own expert, the analysis only revealed that defendant “could not be excluded” from the pool of possible contributors to the DNA mixture of samples collected.[4]
Although the prosecutor acknowledged that the DNA was a mixture and that the hand ligature comparison was based on “partial profile matches” of YSTR DNA, the prosecutor aggressively argued the view that defendant’s DNA conclusively matched that found at the crime scene and on the victim. However, the expert testified on direct and cross-examination to just the opposite, and described the significant limitations of the YSTR DNA testing conducted in this case. Significantly, the expert testified that she could not state positively the total number of DNA contributors to the hand ligature sample, no wide statistical comparisons were made to identify the potential number of men who would be included in the pool of possible contributors, and that the hand ligature sample contained limited information possibly due to degradation of the DNA.
Nevertheless, the prosecutor’s comments negated the main shortcoming of YSTR DNA analysis — that it can only reveal that an individual is not excluded from the pool of persons with the same DNA profile as that found at the scene. She argued that of the people who were with the victim around the time of her murder, only defendant matched the hand ligature DNA profile. However, this was in direct contravention of the expert testimony on cross-examination:
“[Defense counsel:] Now, can you tell us with a reasonable degree of scientific certainty that [defend *782 ant’s] DNA is present on this hand ligature sample that you tested?
“[Answer:] No, I cannot. All I can say is I can’t exclude him.”
The prosecutor’s attempt to establish defendant as the sole contributor also contradicted the expert’s testimony on cross-examination that it was possible that three individuals contributed to the DNA mixture on the hand ligature. It also minimized and ignored the expert’s testimony that the lab was able to obtain reportable results on only four of the 12 areas of the Y chromosome tested, which constituted a “partial profile,” meaning the lab obtained a limited amount of information, and that it was possible that, before testing, the sample had degraded over time. The prosecutor compounded these misrepresentations when she further asserted — again in contravention of the expert testimony — that there was “no reasonable explanation for [defendant’s] DNA on that ligature.”[5]
While the prosecutor was entitled to fair comment on the DNA evidence available in this case, she was not entitled to present the results in a manner that was contrary to the evidence and the science. By interspersing references to DNA on the ligature with comments about defendant’s DNA profile, the prosecutor mischaracterized the probativeness of the DNA evidence.
As the prosecutor acknowledged during her summation, and as the People concede on this appeal, the case against the defendant is circumstantial. Apart from the forensic experts’ testimony, the remaining trial evidence established only that defendant was one of at least two people seen with the victim before her death, and then in her car after the approximate time of the murder. Defendant’s statement that he engaged in sex with the victim was not proof of his role in her death, and the jury in fact acquitted the defendant of rape, apparently crediting the defense that the sex was consensual, and rejecting part of the prosecution’s version of the events. Thus, only the DNA evidence was left to connect defendant to the murder. Defense counsel, therefore, could not allow these misrepresentations to stand unchallenged.
*783 Moreover, failing to object to the prosecutor’s misstatements cannot be attributed to reasonable trial tactics because the summation undermined what, until that point, had been a rather effective defense strategy of identifying the weaknesses of the DNA evidence. He secured an admission from the expert on cross-examination that she could not confirm defendant’s DNA was on the hand ligature, and he solicited testimony that YSTR DNA analysis has several limitations, and that the DNA might have been degraded. Defense counsel could not have reasonably chosen a strategy of allowing the prosecution to misrepresent the strength of the DNA evidence and equate the results of the testing with a finding that defendant was the sole match for the hand ligature DNA sample.
Indeed, the potential danger posed to defendant when DNA evidence is presented as dispositive of guilt is by now obvious. As this Court previously recognized, “forensic DNA testing has become an accurate and reliable means of analyzing physical evidence collected at crime scenes and has played an increasingly important role in conclusively connecting individuals to crimes” (People v Pitts, 4 NY3d 303, 309 [2005]). Courts and commentators have remarked on the unique status of DNA evidence within the criminal justice system and in the minds of jurors. “Modern DNA testing can provide powerful new evidence unlike anything known before” (District Attorney’s Office for Third Judicial Dist. v Osborne, 557 US 52, 62 [2009]). The persuasiveness of DNA evidence is so great that as one commentator noted, “[w]hen DNA evidence is introduced against an accused at trial, the prosecutor’s case can take on an aura of invincibility” (Robert Aronson & Jacqueline McMurtrie, The Use and Misuse of High-Tech Evidence By Prosecutors: Ethical and Evidentiary Issues, 76 Fordham L Rev 1453, 1469 [2007]). Similarly, in a three-case study, the researchers noted that “a mystical aura of definitiveness often surrounds the value of DNA evidence to exonerate the innocent and convict the guilty” (Joel D. Lieberman et al., Gold Versus Platinum: Do Jurors Recognize the Superiority and Limitations of DNA Evidence Compared to Other Types of Forensic Evidence?, 14 Psychol Pub Pol’y & L 27, 27 [2008]). Furthermore, this same aura “that surrounds DNA profiling has led it to become ‘perhaps the most powerful and, thus the most troubling forensic technology to ever be used in a court of law’ ” (id. at 33 [citation omitted]). The studies suggested that “[g]iven the strength of DNA evidence in the face of strong cross-examination (and *784 in the absence of any additional accompanying direct evidence), it appears that jurors may overvalue this high quality, but not flawless, evidence” (id. at 57). The researchers concluded that “[t]he strong and largely invariant impact of DNA evidence across experimental conditions suggests that this type of scientific evidence may be so persuasive that its mere introduction in a criminal case is sufficient to seriously impede defense challenges” (id. at 58).
Our dissenting colleague argues that defense counsel was effective and that we have wrongly concluded that a single failure to object constitutes ineffective assistance (dissenting op at 785, 792-793). That is incorrect and oversimplifies our analysis. We do not base our decision on defense counsel’s failure to object to an isolated, insignificant, albeit erroneous, statement by the prosecutor. As our discussion makes clear, the prosecution’s summation contains numerous misrepresentations of the evidence. The apparent intent was to persuade the jury that the DNA established that defendant had committed the rape and murder, when the evidence did not, and could not, dispositively establish his guilt. The record also makes clear that defense counsel failed to object throughout the summation, thus presenting multiple failures, different in kind from that identified in People v Turner (5 NY3d 476 [2005]). Given the prosecutorial misrepresentations that define the summation in this case, we disagree with our dissenting colleague that counsel’s inactions are the equivalent of an excusable “single error.”
Furthermore, the appeal before us does not involve a closing argument in which the prosecutor adhered to the trial evidence and employed a certain rhetorical flourish, or merely asked the jury to draw reasonable inferences from the evidence presented at trial. Nor are we presented with the more common and understandable situation in which defense counsel was reluctant to interrupt and bring undue attention to one slightly off comment by the prosecution, and where the summation had little or no impact on the defense. Instead, defense counsel here failed to object when the prosecution’s statements exceeded the “four corners of the evidence” (Ashwal, 39 NY2d at 109), and affirmatively misrepresented the most critical evidence against the defendant.[6] Under these circumstances, defendant was deprived of a fair trial.
*785 Defendant’s remaining contention that the evidence was legally insufficient is without merit. Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

. The fact of the call, but not the time, was confirmed by a police officer who testified that he received a dispatch at 12:40 a.m. and spoke with Evans a few minutes later.

. In autosomal DNA testing, a profile derived from nuclear DNA is compared to another nuclear DNA profile to produce “a statistical expression of the profile’s rarity in certain human populations” (Justice Ming W. Chin et al., Forensic DNA Evidence: Science and the Law, ch 5, Introduction [2015]).

. Defendant claims specifically that trial counsel made a prejudicial statement during his opening statement, did not present an expert witness to testify about Y chromosome DNA testing, and failed to object to prejudicial statements during the People’s opening statement and summation.

. The dissent contends that “[i]t is irrelevant that the prosecutor referred to defendant’s DNA being inside the victim or on her underwear” (dissenting op at 790) because defendant conceded that he engaged in intercourse with the victim and therefore defense counsel had no basis to object. However, the prosecutor relied on the DNA evidence in support of her theory of the case that the sex was not consensual and that DNA from the panties and vaginal swab matched the DNA on the ligatures, meaning the victim was murdered by the rapists. Thus, defense counsel had good reason to object when the prosecutor misrepresented that the DNA evidence of sexual contact connected defendant to the murder.

. The prosecutor’s own statements establish that she did not consider the DNA as merely “one piece of the puzzle” as the dissent suggests (dissenting op at 791), but rather as the critical piece of evidence that could be used to persuade the jury of defendant’s guilt.

. Our dissenting colleague’s discussion of People v Fisher (18 NY3d 964 [2012]) reveals that his disagreement with us is not so much about whether *785 defense counsel was ineffective for failing to object based on some comparison to Fisher, but instead whether the prosecutor actually misrepresented the evidence, and thus committed prosecutorial misconduct under any standard (dissenting op at 791-792). Unlike the dissent, we believe the prosecutor exceeded the bounds of acceptable commentary. Once she crossed that line, defense counsel should have acted.