People v Oquendo

2026 NY Slip Op 02002

April 2, 2026

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

The People of the State of New York, Respondent,

v

Johnny Oquendo, Appellant.

Decided and Entered:April 2, 2026

110162 CR-24-0013

Calendar Date: February 19, 2026

Before: Garry, P.J., Clark, Pritzker, Mcshan And Corcoran, JJ.

Martin J. McGuinness, Saratoga Springs, for appellant.

Mary Pat Donnelly, District Attorney, Troy (Melissa K. Swartz of Cambareri & Brenneck, Syracuse, of counsel), for respondent.

[*1]

Clark, J.

Appeals (1) from a judgment of the Supreme Court (Andrew Ceresia, J.), rendered March 12, 2018 in Rensselaer County, upon a verdict convicting defendant of the crimes of murder in the second degree, concealment of a human corpse and criminal obstruction of breathing or blood circulation, and (2) by permission, from an order of the County Court of Rensselaer County (Jennifer Sober, J.), entered December 27, 2023, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.

In December 2015, a suitcase containing the body of a deceased woman (hereinafter the victim) was found in the Hudson River near the City of Albany. After police confirmed that the victim was the subject of a missing persons case out of the City of Troy, Rensselaer County, defendant was arrested and charged by indictment with murder in the second degree, strangulation in the first degree and concealment of a human corpse. The strangulation charge was reduced to criminal obstruction of breathing or blood circulation during pretrial proceedings. A jury trial thereafter ensued and defendant was convicted of all counts. Supreme Court (Ceresia, J.) sentenced defendant, as a second felony offender, to a prison term of 25 years to life on the murder conviction, to run consecutively with a prison term of 2 to 4 years on the conviction of concealment of a human corpse and concurrently with a one-year jail term on the conviction of criminal obstruction of breathing or blood circulation. County Court (Sober, J.) thereafter summarily denied defendant's pro se CPL 440.10 motion to set aside the verdict. Defendant appeals from the judgment of conviction and, by permission, the denial of his CPL article 440 motion.

Defendant contends that the verdict is not supported by legally sufficient evidence and is contrary to the weight of the evidence, arguing that the proof at trial did not establish his identity as the perpetrator of the crimes charged. We disagree. "[I]n conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crimes charged" (People v James, 245 AD3d 1102, 1104 [3d Dept 2026] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]). By contrast, when conducting a weight of the evidence analysis, "this Court must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People [*2]v Mack, 244 AD3d 1289, 1290 [3d Dept 2025] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d at 495). "To be satisfied that the jury was justified in finding guilt beyond a reasonable doubt in a circumstantial evidence case," such as the one here, we must find that "the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence" (People v Baque, 43 NY3d 26, 30 [2024] [internal quotation marks and citation omitted]; accord People v Bohn, 242 AD3d 1357, 1366 [3d Dept 2025]).

As charged to the jury, "[a] person is guilty of murder in the second degree when. . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). "A person is guilty of criminal obstruction of breathing or blood circulation when, with intent to impede the normal breathing or circulation of the blood of another person, he or she . . . applies pressure on the throat or neck of such person" (Penal Law § 121.11 [a]). Finally, "[a] person is guilty of concealment of a human corpse when, having a reasonable expectation that a human corpse or a part thereof will be produced for or used as physical evidence in . . . an official proceeding; . . . an autopsy as part of a criminal investigation; or . . . an examination by law enforcement personnel as part of a criminal investigation; such person, alone or in concert with another, conceals, alters or destroys such corpse or part thereof with the intent to prevent its production, use or discovery" (Penal Law § 195.02).

The trial evidence established that the victim was last seen alive in the City of Troy on the evening of November 22, 2015. A suitcase containing her remains was subsequently found on the bed of the Hudson River near the City of Albany a little over a month later. As for the circumstances of the victim's disappearance, the People elicited testimony from the victim's former coworker, who explained that they worked together at a restaurant in the Lansingburgh neighborhood of Troy in November 2015 and that he often drove her back to her residence after their shifts ended. On the evening of November 22, 2015, however, the victim asked the coworker to drop her off several blocks down from where she lived near downtown Troy, testifying that he did so around 9:00 p.m. and that he never saw her again after that date. Although the coworker was aware that the victim was in a physically tumultuous relationship with another woman at the time of her disappearance, he did not observe any bruises on her body when he dropped her off that evening.

In an attempt to link defendant, the victim's stepfather, to her disappearance, the People presented evidence that defendant lived in a building on Third Street near downtown Troy on the evening of November 22, 2015 and that the last outbound call placed from the victim's phone [*3]number was to defendant. The call was made at 9:10 p.m. on the evening of the victim's disappearance and lasted for a total of eight seconds. All calls received by the victim's phone thereafter went to voicemail. The People also called three occupants of the first-floor apartment of the building in which defendant resided in November 2015 to testify about an incident that occurred at the residence on the evening of the victim's disappearance. In that regard, one of the first-floor occupants (hereinafter witness 1) testified that, while she was attempting to fall asleep around 10:00 p.m. on November 22, 2015, she heard a man and a woman arguing in an upstairs apartment. She explained that the second-floor apartment was vacant, and defendant lived in the third-floor apartment. Witness 1 thereafter "heard a loud scream and a bump" that sounded like "a weight being dropped on the ground." She did not subsequently hear any additional arguing in the upstairs apartment after that sound. Around 11:00 p.m., while witness 1 was watching television in the living room with her roommates, she heard "bumps coming down the stairs like someone [was] carrying something heavy" and then "something large fell and hit [the] door." Two other occupants of the first-floor apartment (hereinafter witnesses 2 and 3) also described hearing a crashing sound in the stairwell of the building around 11:00 p.m. on November 22, 2015 and that something "large" fell and hit their front doors, causing the doors to bow inward.FN1 After hearing the sound of footsteps rushing down the stairs, witnesses 2 and 3 opened their apartment door and encountered defendant in the hallway with a "very large" roller suitcase; he was attempting to fix a broken stair banister. Witness 2 described the suitcase as "[p]urplish blue" in color and witness 3 described it as dark purple. Witness 2 testified that, when he asked defendant if he needed any help, defendant "wouldn't face [him]," was "being dismissive" and was "shooing [him] away." Defendant then left the building with the suitcase and witness 3 described that defendant "struggled" to get it outside.

The People also presented evidence of surveillance video footage depicting an individual walking with a dark roller suitcase throughout downtown Troy between 11:15 p.m. and 11:30 p.m. on November 22, 2015, shortly after defendant had been seen leaving his building on Third Street with a suitcase. The individual depicted in the footage was wearing a dark jacket with a hoodie pulled over his or her head. Notably, around 11:25 p.m., a surveillance camera captured footage of a person wearing what appears to be the same clothing pulling a suitcase along River Street toward the intersection with Third Street and then crossing River Street in the direction of the Hudson River. Approximately 20 minutes later, a camera at the intersection of Third Street and Congress Street in downtown Troy captured footage of an individual in similar clothing walking south [*4]on Third Street — in the direction of defendant's apartment — with no suitcase in tow.

During the investigation into the victim's disappearance, police located a strip of grass "just along the edge of the seawall" in Riverfront Park in downtown Troy where "some vegetation . . . had been matted down" and "impressions [were] in the dirt." A few days later, while performing a grid search of the Hudson River, police located a suitcase handle on the riverbed in an area north of Albany.FN2 After a suitcase was spotted in the river near the Dutch Apple Cruise landing in downtown Albany, investigators focused their search efforts further south from Troy. On December 30, 2015, while performing a grid search of the riverbed in the vicinity of Albany, police divers located and pulled from the river a black suitcase that was missing its handle. The victim's deceased body was found naked and folded into the suitcase. At trial, defendant's ex-girlfriend identified the suitcase containing the victim's remains as belonging to defendant, explaining that she lived with defendant in the third-floor apartment in Troy from July 2015 until November 20, 2015 and had seen the suitcase on several occasions during that period. The ex-girlfriend, who moved out of the subject apartment only two days prior to the evening in question, also confirmed that the second-floor apartment in defendant's building was vacant in late November 2015, that defendant owned a coat like the one depicted in the surveillance footage from the evening of November 22, 2015, and that he often wore a do-rag or a hoodie when outside in the fall months.

As for the physical evidence in this case, Michal Sikirica, the Rensselaer County Medical Examiner, testified that he performed an autopsy of the victim and that she presented with several external and internal injuries, including bruising and swelling around the right side of her face, a right eye that was bruised and swollen shut, brown bruises around her chin, small bruises along the right upper chest area, and small hemorrhages along the soft tissue of the right chest wall, the left portion of the hyoid bone, and beneath the scalp. Sikirica explained that the bruising along the side of the hyoid bone was indicative of "blunt force or compressive injury [having been] applied" to that area and that the bruising on the side of the victim's face was consistent with blunt force trauma. He further testified that there was a plastic shopping bag from Hannaford grocery store "fastened around [the victim's] neck," with the "lower edge . . . rolled tightly into almost a rope-like configuration" and "knotted with that rolled edge." When Sikirica removed the bag from the victim's neck, he observed furrowed impressions in the skin demonstrating that the bag was tied "very tight[ly]." Sikirica opined, within a reasonable degree of medical certainty, that the cause of the victim's death was "[b]lunt force trauma to the head with asphyxia due to suffocation due to [*5]restriction of ventilation." Sikirica further testified that he performed a sexual assault kit on the victim and that there were no signs that the victim had been sexually assaulted. Nevertheless, the People used the findings from the sexual assault kit in an attempt to establish that defendant had access to the victim around the time of her death, proffering evidence that "sperm" was present on the vaginal, cervical and vulvar swabs obtained from the victim and that defendant and "his biological paternal relatives c[ould] be included as possible contributors" to the YSTR DNA profile FN3 of the sperm on such swabs. An STR DNA analysis of the sperm on the vulvar swabs — which can generate more precise results than YSTR DNA testing — demonstrated a match to defendant, with the forensic analyst placing "the probability of selecting an unrelated individual" as being "less than one in 320 billion." A mixture profile of STR DNA was also found on the nonsperm fraction of the vulvar swab and defendant was identified as the major contributor. The sperm fraction of the vaginal swabs contained a mixture profile of STR DNA, which "was consistent with DNA from [the victim] admixed with DNA from at least one additional donor, at least one of which [wa]s male," but there was insufficient information to make a further comparison.

In defense of the charges, defense counsel elicited testimony and presented evidence in support of a theory that someone else was responsible for the victim's death. To that end, when cross-examining the People's witnesses, defense counsel elicited testimony demonstrating that no forensic evidence had been found to link defendant to the suitcase, its handle or the plastic bag tied around the victim's neck. Nor were any blood remnants located in defendant's apartment during the execution of two search warrants at the premises following the victim's disappearance.FN4 Defense counsel also vigorously challenged the credibility of defendant's ex-girlfriend, who had identified the suitcase in which the victim was found as defendant's, and emphasized to the jury that the two occupants of the first-floor apartment who saw defendant with a suitcase in the common area of the first floor around 11:00 p.m. on the evening of the victim's disappearance described the suitcase as purple instead of black like the one containing the victim's body.

Defense counsel also called several witnesses to the stand at trial, including a police detective involved in the investigation into the victim's disappearance. The police detective revealed that, during the investigation, the police department received a tip that someone had seen the victim standing on the corner of Fourth Street and Tyler Street in the City of Troy at 11:30 p.m. on November 22, 2015 — i.e., approximately 30 minutes after witnesses saw defendant leave his apartment building in Troy with a suitcase. Defense counsel also elicited testimony from a witness whose brother had previously dated the victim[*6], who claimed that he saw the victim alive and talking to a man on the corner of Third Street and Liberty Street in Troy around 11:30 p.m. on November 22, 2015. However, on cross-examination, this witness conceded that he could have "[p]ossibly" made this observation prior to 11:00 p.m., that it was dark outside, that his brother had dated the victim several years prior, and that he observed the interaction from across the street. Another witness recalled seeing the victim on the morning of November 21, 2015, testifying that she was standing with a man on the corner of Fourth Street and Washington Street in the City of Troy, that she was crying, and that he heard her state to the man that she was standing next to: "[p]lease don't bring me back there [be]cause he's gonna kill me." This witness further testified that a woman he was with that morning placed her hand on the victim's arm, told her not to worry, and that "God w[ould] be with [her]," and that the man who was with the victim responded by stating: "[a] lot sooner than you think." Defense counsel also elicited testimony that, shortly after the victim's disappearance, contents from her purse were found on the sidewalk on Fourth Street and Washington Street, approximately a block away from her apartment.

When viewing the foregoing evidence in the light most favorable to the People, there is a "valid line of reasoning and permissible inferences" from which the jury could conclude beyond a reasonable doubt that defendant committed the crimes charged (People v Stanley, ___ AD3d ___, ___, 2026 NY Slip Op 00941, *1 [3d Dept 2026]; see People v Dorvil, 234 AD3d 1106, 1110 [3d Dept 2025], lv denied 44 NY3d 982 [2025]; People v Grady, 233 AD3d 1369, 1371-1372 [3d Dept 2024], lv denied 43 NY3d 963 [2025]). Accordingly, the verdict is supported by legally sufficient evidence. Turning to the weight of the evidence, we recognize that the case against defendant was entirely circumstantial and that defendant proffered evidence in support of a theory that someone else killed the victim. Had the jury credited defendant's theory, a different verdict would not have been unreasonable. However, as noted by the Court of Appeals, "[c]ircumstantial evidence . . . may be stronger than direct evidence" in certain instances (People v Geraci, 85 NY2d 359, 369 [1995]; see People v Cleague, 22 NY2d 363, 367 [1968]), and, in this case, the People presented compelling circumstantial evidence linking defendant to the victim's death.

To that end, in addition to eliciting testimony that the victim had been dropped off near downtown Troy in the general vicinity of defendant's apartment around 9:00 p.m. on the evening of her disappearance, the proof demonstrated that the last outbound call placed from her phone was at 9:10 p.m. that evening to defendant. After the victim had been dropped off by her coworker in the vicinity of defendant's apartment and placed a call to defendant, an occupant of the first-floor apartment of the [*7]building in which defendant resided recalled hearing a man and a woman arguing in defendant's apartment between 10:00 p.m. and 11:00 p.m., followed by a loud scream and a crashing sound. Thereafter, around 11:00 p.m., three occupants of the first-floor apartment independently testified that they heard a loud crashing sound coming down the stairs and that an object hit the front doors to their apartment, causing them to bow inward. When two of the first-floor occupants went to investigate the source of the noise, they observed defendant standing in the hallway next to a large rolling suitcase, attempting to fix a broken stair banister. Defendant was then observed struggling to take the suitcase outside, permitting a reasonable inference that the suitcase contained something heavy. Shortly after defendant was seen leaving his apartment building with a suitcase, surveillance footage captured an individual wearing a dark coat with a hoodie over his or her head walking in downtown Troy in the direction of the Hudson River with a rolling suitcase in tow. An individual wearing the same clothing was later captured walking back in the direction of defendant's apartment on Third Street without a suitcase around 11:45 p.m. that night. Although the suitcase containing the victim's remains was eventually located on the riverbed near Albany, the ex-girlfriend identified it as belonging to defendant and the matted-down area of grass and impressions in the dirt along the edge of the seawall in Riverfront Park in Troy permitted a reasonable inference that the suitcase had been deposited into the Hudson River from Troy.

When viewing the evidence in "a neutral light and weighing the 'relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn [therefrom]' " (People v Bohn, 242 AD3d at 1366, quoting People v Sanchez, 32 NY3d 1021, 1023 [2018]), we are satisfied that defendant's identity as the perpetrator of the victim's homicide is "the only [inference] that can fairly and reasonably be drawn from the facts" and that the evidence "excludes beyond a reasonable doubt every reasonable hypothesis of innocence" (People v Baque, 43 NY3d at 30 [internal quotation marks and citation omitted]; see People v Bohn, 242 AD3d at 1366). Additionally, the fact that the victim was found with a Hannaford shopping bag wrapped around her neck and that she died as the result of "asphyxia due to suffocation due to restriction of ventilation" amply supports the jury's finding that the killing was intentional (see People v Cartagena, 149 AD3d 1518, 1518-1519 [4th Dept 2017], lv denied 29 NY3d 1124 [2017]; People v Ryder, 146 AD3d 1022, 1024 [3d Dept 2017], lv denied 29 NY3d 1086 [2017]). Accordingly, the verdict on the murder charge is not against the weight of the evidence. The convictions on the concealment of a human corpse and criminal obstruction of breathing or blood circulation charges are also supported by the weight of [*8]the evidence (see Penal Law §§ 195.02, 121.11; People v Harris, 203 AD3d 1320, 1327-1328 [3d Dept 2022], lv denied 38 NY3d 1033 [2022]; People v McClendon, 199 AD3d 1233, 1236 [3d Dept 2021]).

Next, we are unpersuaded by defendant's contention that he was deprived of a fair trial when the People twice elicited testimony from witness 3 that, during a second interaction with defendant approximately a week after the victim's disappearance, defendant asked whether police had been by the residence looking for him and stated that he "kinda messed up and needed to get a lawyer." Defendant argues that the testimony about him stating that he needed a lawyer after the victim's disappearance was improper and unduly prejudicial. Under the circumstances of this case, we disagree. Although defendant correctly notes that "[a] defendant's invocation of his or her right . . . to counsel during a custodial interrogation may not be used against him or her as part of the People's case-in-chief" (People v Serrano, 200 AD3d 1340, 1346 [3d Dept 2021], affd 38 NY3d 1180 [2022]; see People v Al-Kanani, 26 NY2d 473, 478 [1970]), such testimony did not concern statements regarding the invocation of the right to counsel while in custody (compare People v Al-Kanani, 26 NY2d at 478; People v Harris, 177 AD3d 1199, 1204-1205 [3d Dept 2019], lv denied 35 NY3d 970 [2020]; People v Johnson, 70 AD3d 1188, 1190-1191 [3d Dept 2010]; People v Murphy, 51 AD3d 1057, 1058 [3d Dept 2008], lv denied 11 NY3d 792 [2008]; People v Knowles, 42 AD3d 662, 665 [3d Dept 2007]). Moreover, any prejudice to defendant from the testimony was appropriately mitigated by Supreme Court, which, in an exercise of caution, immediately sustained defense counsel's objections in response to such testimony, struck the entirety of the witness' testimony about his second interaction with defendant from the record and directed the jury to disregard it. Although defendant faults Supreme Court for failing to give a curative instruction directing the jury not to draw an adverse inference against him from his statement about needing an attorney, he did not ask for such a curative instruction, rendering his challenge to the failure to give one unpreserved (see People v Bonaparte, 196 AD3d 866, 869 [3d Dept 2021], lv denied 37 NY3d 1025 [2021]; People v Hilts, 187 AD3d 1408, 1416 n 9 [3d Dept 2020], lv denied 36 NY3d 973 [2020]). Under the circumstances of this case, we are satisfied that Supreme Court adequately mitigated any prejudice to defendant resulting from the testimony that he told witness 3 that he needed a lawyer after the victim's disappearance and that he was not deprived of a fair trial by the elicitation of such testimony (compare People v Lentini, 163 AD3d 1052, 1055 [3d Dept 2018];FN5People v Johnson, 70 AD3d at 1190-1191; People v Knowles, 42 AD3d at 665).

Defendant additionally argues that the DNA evidence establishing that his sperm was present on the vulvar swabs obtained during the victim's sexual assault [*9]examination constituted improper Molineux evidence and should not have been admitted into evidence at trial. We disagree. Under the Molineux rule, "evidence of a defendant's prior bad acts or uncharged crimes is generally inadmissible where its purpose is only to show a defendant's bad character or propensity towards crime" (People v Bohn, 242 AD3d at 1367 [internal quotation marks and citations omitted]; see People v Weinstein, 42 NY3d 439, 444 [2024]). Contrary to defendant's contention, the DNA evidence pertaining to the vulvar swabs did not constitute Molineux evidence, as the People did not use the evidence to imply that defendant had committed a prior bad act or an uncharged sex crime (see People v Brewer, 28 NY3d 271, 276 [2016]; People v Everett, 231 AD3d 1296, 1299 n 3 [3d Dept 2024], lv denied 42 NY3d 1052 [2024]). Indeed, defense counsel revealed during his opening statement that defendant and the victim had a consensual sexual relationship and the People did not refute that proposition or imply otherwise, instead using the evidence to establish defendant's access to the victim before her death.

We are similarly unpersuaded by defendant's argument that such evidence was irrelevant to show access in the absence of direct testimony demonstrating that the sperm was deposited in proximity to the date of the victim's disappearance. "Under general evidentiary principles, all relevant evidence is admissible unless its admission violates some exclusionary rule" (People v Bohn, 242 AD3d at 1368-1369 [internal quotation marks and citations omitted]). "Evidence is relevant if it has any tendency in reason to prove the existence of any material fact" (People v Harris, 26 NY3d 1, 5 [2015] [internal quotation marks and citation omitted; emphasis added]). "[E]ven where relevant evidence is admissible, it may still be excluded in the exercise of the trial court's discretion if its probative value is substantially outweighed by the potential for prejudice" (id. [internal quotation marks and citation omitted]). Given that the victim was found in the suitcase naked, we agree with Supreme Court that the jury could reasonably infer that defendant's sperm had been deposited in proximity to the date of the victim's disappearance and, thus, that it was relevant to show access (see generally People v Romualdo, 37 NY3d 1091, 1093 [2021]; compare People v Animshaun, 186 AD3d 497, 497 [2d Dept 2020], lv denied 35 NY3d 1111 [2020]; People v Mount, 285 AD2d 899, 900 [3d Dept 2001], lv denied 97 NY2d 642 [2001]). Moreover, the court appropriately weighed the probative value of such evidence against the risk of prejudice in admitting such evidence.

We are also unpersuaded by defendant's argument that the manner in which the prosecutor characterized the DNA evidence deprived him of a fair trial. In that regard, defendant highlights that, during his opening statement and again on summation, the prosecutor inaccurately stated that defendant's sperm was found "inside" of [*10]the victim, emphasizing that the DNA evidence supported finding only that his sperm was found "on" the victim's vulva and not "in" her vagina. Although the prosecutor's language characterizing the DNA evidence was imprecise — as the YSTR DNA profile obtained from the vaginal and cervical swabs established only that defendant or his biological paternal relatives "c[ould] be included as possible contributors" to the sperm on those swabs — defendant was not deprived of a fair trial as a result. Indeed, this was not a sex crime prosecution, the charges against defendant did not require the People to establish penetration, and the distinction about defendant's sperm being "in" or "on" the victim's vagina was not crucial to establishing access. Contrary to defendant's suggestion, the Court of Appeals' decision in People v Wright (see 25 NY3d 769 [2015]) does not support reversal on this basis. Unlike in People v Wright, here there was STR DNA evidence in the sperm on the victim's vulvar swabs that matched defendant's DNA profile and a DNA analyst testified that the statistical probability of selecting an unrelated individual was "less than one in 320 billion" (see People v Ramsaran, 29 NY3d 1070, 1071 [2017]). In other words, there was DNA evidence in this case that directly linked defendant to the victim, rendering the imprecise language used by the prosecutor substantially less prejudicial than the statements made by the prosecutor in People v Wright (25 NY3d at 780-785). There was also more compelling proof connecting defendant to the victim's murder, independent of the DNA evidence, than there was in People v Wright. On this record, we conclude that the prosecutor's language describing the DNA evidence did not deprive defendant of a fair trial (see People v Longo, 212 AD3d 471, 472 [1st Dept 2023], lv denied 40 NY3d 935 [2023]; People v Gertz, 204 AD3d 1166, 1171 [3d Dept 2022], lv denied 38 NY3d 1070 [2022]; compare People v Wright, 25 NY3d at 780-785).

Turning to the appeal from the denial of defendant's CPL 440.10 motion, he argues that County Court erred in denying the motion without a hearing on his claim of ineffective assistance of counsel (see CPL 440.10 [1] [h]).FN6 However, inasmuch as defendant's nonrecord-based claim of ineffective assistance of counsel is predicated solely upon conclusory and unsubstantiated allegations, he did not demonstrate his entitlement to a hearing and County Court did not abuse its discretion in summarily denying the motion (see CPL 440.30 [4] [d]; People v Wright, 27 NY3d 516, 520 [2016]; People v Carota, 235 AD3d 1069, 1072 [3d Dept 2025], lv denied 43 NY3d 962 [2025]; People v Hooker, 230 AD3d 1465, 1468 [3d Dept 2024]). Defendant's remaining contentions, to the extent not expressly addressed, have been considered and found lacking in merit.

Garry, P.J., Pritzker, McShan and Corcoran, JJ., concur.

ORDERED that the judgment and the order are affirmed.

Footnotes

Footnote 1: Like witness 1, witness 3 also recalled having previously heard a man and a woman arguing upstairs around 9:30 p.m. or 10:00 p.m. that evening.

Footnote 2: The City of Troy is north of the City of Albany.

Footnote 3: YSTR DNA testing is a method that analyzes the Y chromosome. A match utilizing such method establishes only that a particular male cannot be "exclud[ed] . . . from the pool of contributors with the DNA characteristics identified through the YSTR DNA test" (People v Wright, 25 NY3d 769, 776 [2015]).

Footnote 4: Police did find plastic Hannaford shopping bags in defendant's apartment during the execution of the search warrants.

Footnote 5: Defendant's contention that People v Lentini (163 AD3d 1052) is controlling on this issue and requires reversal is based upon an overly broad reading of that decision.

Footnote 6: On appeal, defendant challenges the denial of his CPL 440.10 motion only as it pertains to his ineffective assistance of counsel claim raised therein, rendering the other claims he asserted in the motion abandoned (see People v Hoffler, 74 AD3d 1632, 1633 n 2 [3d Dept 2010], lv denied 17 NY3d 859 [2011]).