■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v VISHNUDATT NISTHALAL, Appellant. [928 NYS2d 588]—

The defendant and codefendant Rasheen Sweeney were convicted, after a joint jury trial, of murder in the second degree in connection with the shooting death of victim Yamile Puentes during the early morning hours of January 18, 1993, in the vicinity of the intersection of 37th Road and 77th Street in Jackson Heights, Queens. Upon the exercise of our factual review power (*see* CPL 470.15), we agree with the defendant that his conviction was against the weight of the evidence.

In conducting our weight-of-the-evidence analysis, we must first determine, based upon the credible evidence, whether a different result would have been unreasonable and, if it would not have been, then we must " 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (*People v Bleakley*, 69 NY2d 490, 495 [1987], quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62 [1943]). Applying this standard of review to the proof adduced at the defendant's trial, we determine, in the first instance, that an acquittal on the sole charge of murder in the second degree that was submitted to the jury would not have been unreasonable based upon the evidence presented and, moreover, that the jury failed to accord the evidence the weight it should have been accorded (*see People v Romero*, 7 NY3d 633 [2006]). Indeed, the testimony of the

various prosecution witnesses was so fraught with inconsistencies and contradictions that it failed to provide a credible foundation for the defendant's conviction.

The theory of the prosecution's case was that the defendant, the proprietor of an after-hours social club on Roosevelt Avenue near 76th Street in Jackson Heights, ordered the murder of the victim, a club patron, by directing two bouncers employed at the club, the codefendant Sweeney and one "Mohammad," to kill him. The bouncers then allegedly escorted the victim out the rear door of the club at gunpoint, walked him a block or two away and, after a noisy scuffle in which the victim pleaded for forgiveness, executed him when Mohammad fired a single bullet into his head, while Sweeney stood a short distance away and acted as a lookout. However, the accounts of these alleged events provided by the prosecution's witnesses were so contradictory as to be unworthy of belief.

For example, a bartender and a disc jockey employed at the club on the night in question provided widely divergent accounts of the events that transpired in the club prior to the killing. The Spanish-speaking disc jockey testified at trial that he overheard the defendant, the codefendant Sweeney, and Mohammad plotting the murder of the victim in English as they sat together at the bar, and that Sweeney and Mohammed were employed as bouncers at the club. Nevertheless, the disc jockey failed to mention this crucial conversation when he initially spoke to a detective about the crime. Additionally, the disc jockey claimed that he could understand English well and, thus, was able to comprehend the nature of the men's conversation. However, he subsequently admitted that, one week after these events, he required—as he did at trial—the assistance of a Spanish translator to understand a threat allegedly made to him by the defendant in English because "at that time I was not able to understand a lot." Furthermore, the disc jockey claimed that he quit his job at the club in response to this threat some three weeks after the January 1993 murder, but he admitted on cross-examination that he had actually already been fired from the job by that time. Moreover, the bartender insisted that Mohammad "[n]ever" worked at the club, that the men stood near the entrance of the club and did not sit near the bar, and that the disc jockey was across the room playing music at the time the defendant and Sweeney were conversing near the entrance, making it impossible for her to overhear anything they said from her position, which was closer to the men than that of the disc jockey.

Even more damaging to the credibility of the disc jockey was

the fact that the defense produced witnesses and photographic evidence persuasively indicating that the disc jockey actually continued to work at the club for several years after the killing, until he was fired in mid-1996. Similarly, while the bartender testified that only Mohammad escorted the victim to the rear door of the club, and that Sweeney was present at his security post at the club's entrance when she left the premises approximately 20 minutes later, the disc jockey testified that both Sweeney and Mohammad escorted the victim out through the rear door, and that Sweeney did not return to the club until approximately one hour later, when the disc jockey let him in through the rear door. The bartender further asserted that the defendant told her "Mohammad killed the guy" prior to her departure from the club some time before 5:00 A.M. However, the testimony of an eyewitness to the shooting, the contents of a recording of a telephone call to the 911 emergency number, and the testimony of the responding police officer established that the shooting did not even occur until approximately 5:20 A.M. Police evidence further established that the bartender told an investigating detective that she did not learn of the victim's death until the day after it occurred, a statement which she insisted at trial that she never made to the detective. Moreover, despite their claims that they both were deeply disturbed by the events to which they testified, neither the disc jockey nor the bartender promptly reported the alleged murder conspiracy to the police. Indeed, the bartender admitted that she never reported it, while the credible evidence indicates that the disc jockey waited some 11 years, during which he relocated to Florida and then returned to New York, before he reported the matter to the police after he happened to see the defendant in a laundromat.

Similar problems existed with regard to the testimony of the prosecution witnesses who observed events outside the social club. For example, witness Ralph Rivera lived on 77th Street, and was a self-styled "community activist" and "community leader" who visited with the local police "nearly every day," and had taken some classes on police procedures at the New York City Police Academy. Rivera claimed that, from his fifth-floor apartment, he witnessed two assailants beat up the victim, who repeatedly cried out in Spanish "Oh my God, forgive me." According to Rivera, one of the assailants then dragged the victim across the street and shot him while the other stood some distance away and appeared to act as a lookout. Rivera further believed that he saw one of the assailants enter a burgundy or red car on 37th Road. However, when the recordings of the 911 telephone calls made by Rivera were played at

trial, they demonstrated that he initially described the incident as a mugging and, contrary to his trial testimony, the recordings revealed that he mentioned only one assailant throughout his conversation with the 911 operator, which took place simultaneously with his observation of the events. Furthermore, while Rivera provided fairly detailed descriptions of the builds and some facial features of the two assailants at trial, he told the 911 operator, contemporaneously with his observations, that he was unable to provide a description of the lone assailant. Additionally, when police officers arrived at the murder scene, Rivera again referred to only one assailant. He then rode with them as they canvassed the area, and he identified one Gregory Freeman, a passenger in a blue car on 41st Avenue, as the shooter, indicating that he was 99% certain of his identification. Nevertheless, when he subsequently viewed a lineup at the police precinct, Rivera became so unsure of his identification of Freeman that the police voided Freeman's arrest in connection with the murder of the victim.

Robert O'Connor, the driver of the blue car in which Gregory Freeman had been a passenger, also testified on behalf of the prosecution. O'Connor and his passengers, who had used cocaine earlier that night, were in this area of Jackson Heights known for a high volume of drug sale activities at about the time of the killing in order to steal cocaine from drug dealers. O'Connor testified that he observed two men attacking a third person in the vicinity of 37th Road, and that Gregory Freeman exited the vehicle and attempted to interfere with the attack, only to be warned by one of the men that the matter was none of his concern. However, in stark contrast to Rivera's testimony, the victim that O'Connor saw was a woman and, according to O'Connor, she repeatedly screamed, in English, "Please don't. Somebody help me." O'Connor testified that he honked his horn in an effort to draw attention to the incident and help the woman. He did not witness the shooting of Yamile Puentes.

The testimony of these prosecution witnesses was so contradictory, and was so inconsistent with the police testimony and other evidence in so many key respects, that it could not credibly support the defendant's conviction of murder in the second degree. Accordingly, we reverse the conviction as against the weight of the evidence (see People v Fortunato, 70 AD3d 851 [2010]; People v Zephyrin, 52 AD3d 543 [2008]; People v Giocastro, 210 AD2d 254 [1994]).

In view of the foregoing, we need not consider the defendant's remaining contentions. Mastro, J.P., Hall, Lott and Cohen, JJ., concur.