Supreme Court, Appellate Division
Third Judicial Department

Decided and Entered:  July 14, 2016          108003
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                Respondent,

       v                          MEMORANDUM AND ORDER

GANESH R. RAMSARAN,
                Appellant.
_____


Calendar Date:  June 1, 2016

Before:  Peters, P.J., Rose, Mulvey and Aarons, JJ.

_____


       Cheryl Coleman, Albany, for appellant.

       Joseph A. McBride, District Attorney, Norwich (Michael J. Genute of counsel), for respondent.

_____


Mulvey, J.

       Appeal from a judgment of the County Court of Chenango County (Revoir Jr., J.), rendered December 1, 2014, upon a verdict convicting defendant of the crime of murder in the second degree.

       On December 11, 2012, Jennifer Ramsaran (hereinafter the victim) went missing after last being seen at her home in the Village of New Berlin, Chenango County.  After the victim's body was found in February 2013, it was determined that she had been killed by unnatural causes some months prior, although the exact cause of death could not be determined.  Defendant, the victim's husband, was thereafter charged by indictment for her death with one count of murder in the second degree.  After a jury trial, defendant was convicted as charged and sentenced to 25 years to

life in prison.  Defendant now appeals.

Initially, we find no error in County Court denying defendant's motions to dismiss the indictment.  The record does not reflect, as urged by defendant, that the People injected hearsay evidence into the grand jury proceeding or engaged in intentional misconduct so as to prejudice the ultimate decision reached by the grand jury and, therefore, the extreme remedy of dismissing the indictment is not warranted (see People v Boddie, 126 AD3d 1129, 1130 [2015], lv denied 26 NY3d 1085 [2015]; People v Miller, 110 AD3d 1150, 1150-1151 [2013]).

Next, we are unpersuaded by defendant's contention that, given the wholly circumstantial nature of the case, the verdict was not supported by legally sufficient evidence and is against the weight of the evidence.  Even when a case is based upon circumstantial evidence, the legal sufficiency of the evidence is established when, "viewing the evidence in the light most favorable to the prosecution, there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Reed, 22 NY3d 530, 534 [2014] [internal quotation marks and citations omitted]).  To convict defendant of murder in the second degree, the People were required "to prove beyond a reasonable doubt that defendant caused the victim's death after having acted with the intent to do so" (People v Wlasiuk, 136 AD3d 1101, 1102 [2016], lv denied 27 NY3d 1009 [2016]; see Penal Law § 125.25 [1]).

At the trial, the People elicited testimony that defendant made a missing person report to the police around 7:54 p.m. on December 11, 2012.  Defendant reported that the victim had left to go on a shopping trip to the City of Syracuse, Onondaga County at approximately 10:00 a.m. that day and was supposed to return home at 5:00 p.m.  According to the police officer who responded to defendant's report of a missing person, defendant was "adamant something terrible had happened" to the victim.  The police officer testified that, when he asked defendant about the state of his marriage, defendant indicated that his marriage was perfect.  Thomas Renz, the victim's father, testified that defendant called him on December 11, 2012 around 5:30 p.m. upset,

telling him that the victim had not returned from a shopping trip and that he was going to call the police. Testimony also established that defendant called a friend around 8:00 p.m. but did not mention that the victim was missing until approximately five minutes into the phone call. The friend offered to come help look for the victim, but defendant declined the offer, saying that he "was trying to maintain a sense of normal[cy] for the kids."

When interviewed by the police regarding the events of December 11, 2012, defendant indicated that, after returning home from taking the children to school, he started working from home on his computers. However, a computer forensic investigator who analyzed both of defendant's work computers testified that one of the computers remained idle on that day. The other computer was used until approximately 8:08 a.m. and, at approximately 8:15 a.m., a program was installed on that computer in which, after approximately one minute, the installation process became automatic and lasted until 8:24 a.m. No further computer activity was noted until 6:31 p.m.

With regard to the victim, the People presented evidence that, on the morning of her disappearance, she was playing an online game that she abruptly left around 8:15 a.m. without explanation. The victim did not respond to a subsequent message sent around 8:30 a.m. from Robert Houston, with whom the victim regularly played the online game, as to why she left the game. Houston testified that the victim had never before just left a game without explanation. According to Houston, the victim planned to go shopping later in the week, but intended to use her friend Eileen Sayles' car because her van was making strange noises. The People also presented evidence that, on the morning of the victim's disappearance, her cell phone was still connected to defendant's home Wi-Fi network at 10:57 a.m.

Defendant reported that he went for a run to the YMCA after the victim left on her shopping trip, but testimony at the trial revealed that his statements to the police were inconsistent as to the running route he took that day. Video evidence depicted defendant walking through the YMCA parking lot and entering the building around 12:41 p.m., but defendant does not appear running

on any other surveillance footage from multiple businesses located along the route that he claims to have taken. Testimony established that defendant informed various people at the YMCA that the victim had gone shopping in Syracuse and that he needed to call a friend for a ride home. Defendant then called Sayles, with whom he had been having an affair and who he considered to be his "soulmate," to pick him up. Sayles testified that, during her relationship with defendant, he wanted to have sex with her "[a]ll the time," and that she found it unusual that he did not invite her into the house after she drove him home from the YMCA.

Testimony at trial established that defendant had requested a divorce from the victim on various occasions and that he had recently discussed with a friend the negative financial implications of a divorce. The evidence further established that the victim had an upcoming appointment with a divorce attorney. Sayles testified that defendant pressured her to divorce her husband and once wrote that he "would have done everything and anything for [them] to be together." The People also introduced testimony and other evidence regarding defendant's relationship with the victim, his controlling behavior toward her, his intense dislike for her playing online games and his dissatisfaction with her appearance, particularly compared to Sayles. Extensive testimony and evidence was also admitted regarding defendant's obsession with sex and his requests for the victim and Sayles to send him sexually explicit photographs of themselves.

Testimony regarding defendant's unusual behavior following the victim's disappearance was also presented. Five days after the victim disappeared, defendant posted on social media that the victim's funeral would be the first funeral he would ever attend. He also made inappropriate sexual comments to a female acquaintance within days after the victim's disappearance, as well as disparaging remarks about the victim as a mother and wife. Evidence also established that defendant asked Sayles to move in with him, changed her mailing address to his without her permission, opened an email account for her using the name "Eileen Ramsaran" and made over 2,000 phone calls to Sayles from jail following his arrest.

Evidence also established that, the day after the victim

disappeared, defendant located the general location of the victim's cell phone through the "Find My iPhone" application. The police searched the area but they were unable to locate the victim's cell phone. Later that afternoon, defendant searched for the cell phone and reported to the police that a ping sound led him to the location of the cell phone, which was found behind a rock in the grass of a creek bed. Testimony established that, when the police arrived to retrieve the cell phone, no ping sound could be heard. Five days after the victim disappeared, defendant asked Renz to take him for a ride and, as defendant directed Renz the route to drive, Renz noticed the victim's van in plain sight in the parking lot of an apartment complex. After dropping defendant off back home, Renz reported the discovery of the van to police.

Forensic testimony established that large blood stains in the back of the victim's van were a conclusive DNA match with the victim. Analysis on a blood stain on the sweatshirt that defendant wore on the morning that the victim disappeared concluded that defendant was the major contributor of the blood and that the victim could not be excluded as the minor contributor to that blood stain. Furthermore, a forensic expert testified that it was 1.661 quadrillion times more likely that the blood sample from the sweatshirt contained a combination of defendant's and the victim's blood than if two randomly selected individuals were the donors. With regard to the victim's body, found two months after the victim went missing, a forensic pathologist testified that, given the extensive decomposition and animal activity, particularly about the victim's head, face and left side of her body, an exact cause of death could not be determined. However, he testified that, in addition to bruises and lacerations on the victim's body, there was internal bleeding underneath her scalp on the back of her head as if she was struck by something and there were also internal hemorrhages across her back. Based upon the results of his autopsy and the fact that the victim's naked body was found at the bottom of an embankment, the forensic pathologist opined that the manner of death was homicide.

Viewing the evidence in a light most favorable to the People, we find that the evidence is legally sufficient to

support the conviction. Furthermore, as a different verdict would not have been unreasonable, we must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" to determine if the verdict is supported by the weight of the evidence (People v Bleakley, 69 NY2d 490, 495 [1987] [internal quotation marks and citations omitted]; see People v Wlasiuk, 136 AD3d at 1102; People v Cushner, 46 AD3d 1121, 1123 [2007], lv denied 10 NY3d 809 [2008]). Viewing the evidence in a neutral light and deferring to the jury's resolution of credibility, a rational trier of fact could have found that the verdict is not against the weight of the evidence (see People v Wlasiuk, 136 AD3d at 1103; People v Oliver 135 AD3d 1188, 1191 [2016], lv denied 27 NY3d 1003 [2016]).

We do, however, find merit to defendant's contention that certain errors rendered defense counsel ineffective, thereby depriving defendant of a fair trial. "In order to sustain a claim of ineffective assistance of counsel, New York courts [must] examine the trial as a whole to determine whether defendant was afforded meaningful representation" (People v King, 27 NY3d 147, 158 [2016] [internal quotation marks and citations omitted]). "The effectiveness of the assistance of counsel is analyzed in terms of whether 'the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation'" (People v Cassala, 130 AD3d 1252, 1253 [2015], lv denied 27 NY3d 994 [2016], quoting People v Baldi, 54 NY2d 137, 147 [1981]; see People v Wright, 25 NY3d 769, 779 [2015]). A defendant's claim that counsel's performance was deficient must amount to more than "a simple disagreement with [counsel's] strategies, tactics or the scope of possible cross-examination" (People v Flores, 84 NY2d 184, 187 [1994]; see People v McRobbie, 97 AD3d 970, 972 [2012], lv denied 20 NY3d 934 [2012]; People v Arnold, 85 AD3d 1330, 1332-1333 [2011]). However, "[e]ven where counsel's errors individually may not constitute ineffective assistance, the cumulative effect of defense counsel's actions can deprive [a] defendant of meaningful representation . . . [when] the seriousness of the errors [is considered] in the[] totality" (People v Wright, 25 NY3d at 779 [internal quotation marks, brackets and citations omitted]; see

People v Arnold, 85 AD3d at 1334).

We agree with defendant that defense counsel's failure to object to the prosecutor's inappropriate characterization of the DNA testimony and evidence during summation requires reversal. Although "[c]ounsel is afforded wide latitude during summations, . . . when a prosecutor's remarks are so egregious such that they deprive a defendant of a fair trial, reversal is warranted" (People v Rupnarine, ___ AD3d ___, ___ [2016], 2016 NY Slip Op 04257 [2016], *1). Numerous times during the summation the prosecutor mischaracterized the testimony of Daniel Myers, the forensic expert, as well as the DNA evidence found on defendant's sweatshirt. To that end, Myers testified that, with regard to the blood stain found on the sweatshirt that defendant wore on the day that the victim disappeared, the stain consisted of a mixture of profiles, the DNA of which was consistent with defendant being the major contributor admixed with DNA from at least one additional donor. From that, the victim could not be excluded as a possible contributor of the STR/DNA mixture profile and that profile is 1.661 quadrillion times more likely to be observed if donors are defendant and the victim than if two random unrelated people were selected. Myers testified, however, that there were not enough alleles or DNA data to say conclusively that the victim's DNA was present.

Nevertheless, during summation, the prosecutor repeatedly mischaracterized Myers' testimony and the DNA results by stating multiple times that the victim's DNA was on the sweatshirt. Specifically, the prosecutor initially stated that "on that sweatshirt is [defendant's] wife's DNA." Later, when discussing Myers' DNA report, the prosecutor incorrectly stated that the report "shows that [the victim's] DNA was on that area where the bloody spot is." Even if this last statement could be viewed as asking the jury to make an inference from the evidence at trial, the prosecutor again misstated the testimony by saying, "We have the forensic people who say[] . . . [the victim's] DNA is on that sweatshirt, to some degree." Defense counsel made no objections to such characterization of the testimony or DNA analysis. We conclude that, given the purely circumstantial nature of this case, and "[i]n light of the powerful influence of DNA evidence on juries, the opportunity for juror confusion regarding . . .

the qualified nature of the test results, defense counsel's failure to object [to the prosecutor's comments during summation, alone,] rendered him ineffective" (People v Wright, 25 NY3d at 771; compare People v Fisher, 89 AD3d 1135, 1139 [2011], lv denied 18 NY3d 883 [2012]).

While we find that defense counsel's failure to object to the prosecutor's inaccurate and misleading description of the DNA testimony and evidence is sufficient, by itself, to have deprived defendant of a fair trial, we also note that other trial errors by defense counsel, when taken as a whole, lend additional support to defendant's contention that he was deprived of the effective assistance of counsel. The record reflects that defense counsel failed to object to irrelevant and prejudicial testimony elicited from multiple witnesses, including testimony as to defendant's "general demeanor," his relationship with the victim as far back as 1998, his attitude regarding marriage and extensive background information about the victim – including her education, behavior as a mother and relationship with her parents. At one point during the trial, defense counsel stated that he did not object to any of this testimony "out of respect" and because he "[did not] believe it's anything that hurts [defendant]." However, if defense counsel had objected to the prejudicial testimony elicited by the prosecutor as to the victim's sympathetic demeanor or the irrelevant testimony concerning defendant's behavior as far back as 1998, he would have succeeded (see generally People v LaValle, 3 NY3d 88, 113-114 [2004]; People v Humphrey, 15 AD3d 683, 685 [2005], lvs denied 5 NY3d 763 [2005]).

Further, defense counsel presented a confusing and inept summation. Defense counsel often confused relevant legal principles, such as when he stated that "[t]he prosecutor must fulfill his promises in his opening. That's the law," or where he told the jury that it had to be sure beyond an absolute doubt as to defendant's guilt – after which County Court interposed to instruct the jury as to the correct burden of proof. Defense counsel further told the jury, "It's possible [defendant] could have done it," that it was a question he asked himself "a million times," but that a possibility of guilt was not enough and the jury must be "absolutely convinced of everything that [it] heard

here that [defendant was] guilty." In our view, defense counsel's summation was harmful to defendant's case because he confused the jury with his interpretation of the relevant burden of proof and standards of law (see People v Dean, 50 AD3d 1052, 1053 [2008]; compare People v Tommaselli, 102 AD2d 943, 944 [1984]). Standing alone these errors may not have deprived defendant of his right to meaningful representation, but, when viewed along with defense counsel's failure to object to the People's misleading and improper characterization of the DNA testimony and defense counsel's confusing statement regarding the burden of proof during closing arguments, we find that "the cumulative effect" of these errors and "the seriousness of the errors in their totality" further support our conclusion that defendant received ineffective assistance of counsel and he was deprived of a fair trial (People v Wright, 25 NY3d at 779 [internal quotation marks and citations omitted]; see People v Oathout, 21 NY3d 127, 132 [2013]; People v Bush, 107 AD3d 1302, 1303 [2013]; People v Arnold, 85 AD3d at 1334-1335).

Given our determination, we need not address defendant's remaining contentions.

Peters, P.J., Rose and Aarons, JJ., concur.

ORDERED that the judgment is reversed, on the law, and matter remitted to the County Court of Chenango County for a new trial.

ENTER:

Robert D. Mayberger
Clerk of the Court