*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  December 1, 2016                    105822
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v                                        MEMORANDUM AND ORDER

VERONICA L. TAFT,
                        Appellant.
_____

Calendar Date:  October 14, 2016

Before:  McCarthy, J.P., Garry, Lynch, Devine and Clark, JJ.

_____

        Norbert A. Higgins, Binghamton, for appellant.

        Stephen K. Cornwell Jr., District Attorney, Binghamton
(Peter N. DeLucia of counsel), for respondent.

_____

McCarthy, J.P.

        Appeal from a judgment of the County Court of Broome County
(Cawley, J.), rendered February 26, 2013, upon a verdict
convicting defendant of the crimes of murder in the second
degree, manslaughter in the first degree and endangering the
welfare of a child (three counts).

        On December 30, 2010, at approximately 10:00 a.m., police
were dispatched to defendant's residence to respond to a 911
report of a child not breathing.  Police and paramedics arrived
at defendant's home to find defendant, her then boyfriend
(hereinafter the boyfriend) and her two-year-old son (hereinafter
the victim), who was unresponsive and without a pulse.  When a
responding officer spoke with defendant, defendant told him that,
on the prior evening, she had left her four children in the care

of the boyfriend before working from 11:00 p.m. to 7:00 a.m.  The victim was rushed to the hospital, where he was eventually pronounced dead and found to have died due to blunt force impact trauma to his abdomen that resulted in a torn liver and fatal internal bleeding.

In September 2011, defendant was indicted for the crimes of murder in the second degree (depraved indifference murder of a child), manslaughter in the first degree and endangering the welfare of a child (six counts).  Following a jury trial, defendant was convicted of murder in the second degree, manslaughter in the first degree and endangering the welfare of a child as it related to confining the victim in a dark room, hitting and knocking the victim off the couch onto the floor and forcing the victim's face into a pillow.  County Court sentenced defendant to concurrent prison terms of 25 years to life for the conviction of murder in the second degree and 25 years for the conviction of manslaughter in the first degree, to be followed by five years of postrelease supervision, and concurrent one-year jail terms for each of the three convictions for endangering the welfare of a child.  Defendant now appeals.

We agree with defendant that, as to the convictions for murder in the second degree and manslaughter in the first degree, the verdict was against the weight of the evidence.  Pursuant to their theory of the case, the People were required to prove beyond a reasonable doubt that defendant inflicted the trauma that caused the victim's death (see Penal Law §§ 125.20 [4]; 125.25 [4]).  In our weight of the evidence analysis, this Court "sits, in effect, as a thirteenth juror" (People v Cahill, 2 NY3d 14, 58 [2003] [internal quotation marks and citation omitted]; accord People v O'Neil, 66 AD3d 1131, 1132 [2009]).  A weight of the evidence review requires this Court to first determine whether, "based on all the credible evidence[,] a different finding would not have been unreasonable" (People v Bleakley, 69 NY2d 490, 495 [1987]).  Where a different finding would not have been unreasonable, we must "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Ramsaran, 141 AD3d 865, 869 [2016] [internal quotation marks and

citations omitted]).

The sole scientific evidence that was introduced at trial indicated that the victim most likely suffered his injuries more than three hours after defendant had left the victim with the boyfriend and gone to work. In this regard, the People introduced the expert testimony of the forensic pathologist who had conducted an autopsy on the victim. Based on the injuries that the victim sustained, the pathologist "estimated" that the victim would have died approximately an hour after his injuries were inflicted. The pathologist explained that he relied upon records of the victim's body temperature taken at the hospital to determine the victim's time of death, and that the victim "most likely" died at "about 3:00 [a.m.]"[1] Considering the foregoing, the pathologist's calculations indicated that the victim's wounds were inflicted at approximately 2:00 a.m. – more than three hours after defendant had left the home and more than five hours before she returned.

The boyfriend testified that he did not inflict the wounds that led to the victim's death and, essentially, that the period in which he babysat defendant's children was uneventful.[2] For this testimony to be reconcilable with the People's theory of the case, the boyfriend's supervision of the victim – a two-year-old infant – had to be so minimal that he was unable to ascertain that the victim was mortally wounded or deceased during a more

---

[1] Based on questions related to the pathologist's degree of certainty as to his conclusion, the pathologist testified that it was "technically possible" that the victim's time of death was 11:00 p.m. and that it was "within the realm of possibility" that the injuries could have been inflicted at 9:00 p.m. This scenario, however, would assume a 50% error rate in the time of death calculation and would have also doubled the amount of time that it took the victim to die from his injuries.

[2] At the time of the victim's death, unrelated assault charges were pending against the boyfriend.

than eight-hour period.[3] Regarding the night in question, the boyfriend described cooking dinner for the children as defendant left for work at approximately 10:45 p.m. He acknowledged that, shortly after the victim's body was discovered, he had informed police officers that he had fed the children the evening before; when specifically asked whether that included the victim, he responded in the affirmative.[4] However, at trial, the boyfriend testified that, although he had retrieved defendant's youngest daughter from her crib for dinner, which he described as being "two feet" from the bunk bed upon which the victim was lying on the bottom bunk, he "[had]n't take[n] it upon [him]self to wake [the victim] to eat" and that he had assumed the victim had eaten because he later found that his plate was empty. Further, the boyfriend testified to having "tucked in" defendant's three-year-old daughter later that night in the same bottom bunk bed upon which the victim laid without noticing anything amiss with the victim.

During the course of his trial testimony, the boyfriend acknowledged that, while making a phone call in a police interview room shortly after the victim's death, he stated, "I don't know my nigger, this little nigger be running around doing mad shit." The boyfriend also acknowledged stating to a child protective services caseworker, "I'm not getting the death penalty for no accident," but testified that the statement was taken out of context. Moreover, the boyfriend acknowledged at trial that he had been offered immunity if he testified against defendant at the grand jury proceeding — testimony that he eventually gave. Finally, the boyfriend testified that after the victim had been found that morning, and while others attempted to revive him, he had punched a hole in the wall of the apartment.

---

[3] The boyfriend explained that, when he babysat, he did not change diapers and that he tasked defendant's four-year-old daughter with changing the diapers of the victim and defendant's youngest daughter.

[4] According to the People's theory of the case, the victim would have had to have been either mortally wounded or already dead at this point in time.

The boyfriend had stated the same thing to law enforcement after a police investigator had noticed injuries to the boyfriend's knuckles immediately after the victim's death.  In addition, a police investigator examined the wall and concluded that the hole was unrelated to the victim's injuries.

Finally, while defendant's previous paramour (hereinafter the paramour) testified that, on January 10, 2011, defendant called him at approximately 2:00 a.m. and confessed to having caused the injuries that led to the victim's death,[5] the paramour did not make this statement to law enforcement until five months after the victim's death and after he had been arrested on an unrelated charge of violating an order of protection.[6]  He acknowledged that he had reached out to law enforcement after his arrest because he had information about this case and other cases and because he hoped "to get the best deal [that he] could."  In initially meeting with law enforcement, the paramour stated that the boyfriend had confessed to him that he had killed the victim.  Specifically, the paramour told law enforcement that the boyfriend told him that he had found out about the paramour's ongoing sexual relationship with defendant and was upset.  The paramour acknowledged that, on at least four different occasions, he told law enforcement and/or prosecution officials that the boyfriend had confessed to killing the victim.

At trial, however, the paramour testified that he had been lying when he said that the boyfriend confessed to the killing. He testified that it was only after a law enforcement officer confronted him and accused him of lying to protect defendant and after conferring with his counsel that he had a "sudden epiphany"

_____

[5]  The paramour acknowledged that he had previously been convicted of criminal contempt, possession with intent to sell narcotics, resisting arrest and menacing.

[6]  The paramour explained that defendant had contacted his girlfriend, which resulted in an argument between the paramour and his girlfriend.  When police responded, the paramour was arrested for violating an order of protection that was in effect that prevented him from having contact with his girlfriend.

and informed the officials that it was actually defendant who confessed to him. Moreover, the paramour's testimony was often contradictory and inconsistent. The paramour initially testified that the only time that defendant acknowledged having injured the victim was during the January 10, 2011 phone conversation. In addition, in earlier recorded statements, the paramour had consistently indicated that defendant had confessed on one occasion. Later during his trial testimony, however, the paramour stated that defendant had confessed to him more than once.[7] When cross-examined about these inconsistent statements, the paramour contended that he had told police about the multiple confessions but that they must have failed to record that portion of his statement.

The paramour also testified that his "intimate" relationship with defendant had become a "platonic" relationship by October or November 2010 before contradicting that testimony with the admission that he continued to have an ongoing sexual relationship with defendant thereafter. Although the paramour had told law enforcement that he "didn't speak to [defendant]" between the alleged January 10, 2011 phone-call confession and seeing her at a bowling alley in March 2011, he testified at trial that he had actually been in touch with her "several times" during that period. The paramour also testified at trial that defendant had never stated where she kicked the victim, but later acknowledged having made a statement to law enforcement that defendant had told him that she had kicked the victim in the abdomen or chest. Initially during his testimony, the paramour was adamant that he had told no one, before he told law enforcement, that defendant had confessed to him. The paramour

---

[7] For example, the paramour testified to an instance in which he had visited defendant's apartment and she had pointed to a hole in the wall and explained that it was where she had slammed the victim. This testimony not only contradicted the paramour's previous testimony and statements, but it also contradicted the People's theory of the case, which was that the hole in the wall was unrelated to the victim's injuries. During closing argument, the People stated that "we know [the boyfriend] punched a hole in the wall."

later testified that he had told his mother about the confession and that his prior testimony that he had not told anyone was incorrect.  Moreover, the paramour acknowledged that he had previously told the police that defendant indicated that she became upset with the victim on December 29, 2010 in part because a child protective services caseworker had visited her that day. Notably, there was no proof introduced that a caseworker had visited defendant on the day leading up to the victim's death.

Weighing the conflicting proof and inferences, we find the jury's verdict that the proof established beyond a reasonable doubt that defendant committed murder in the second degree and manslaughter in the first degree to be against the weight of the evidence (see People v Wright, 139 AD3d 1094, 1095-1096 [2016], lv denied 28 NY3d 939 [2016]; People v Graham, 107 AD3d 1296, 1298 [2013]; People v Nisthalal, 87 AD3d 702, 705 [2011]; People v Grice, 84 AD3d 1419, 1419 [2011], lv denied 17 NY3d 806 [2011]; People v St. Andrews, 82 AD3d 1356, 1358 [2011]; People v Fortunato, 70 AD3d 851, 852-853 [2010]; People v O'Neil, 66 AD3d at 1134; People v Madison, 61 AD3d 777, 777-779 [2009]; People v Jones, 59 AD3d 864, 873 [2009]; People v Zephyrin, 52 AD3d 543, 544 [2008]).  Accordingly, we modify the judgment by dismissing those counts.  In contrast, considering the eyewitness testimony from other witnesses supporting defendant's convictions for endangering the welfare of a child, we find the remainder of the verdict to be supported by the weight of the evidence. Defendant's remaining contentions have been considered and found to be without merit.

Garry, Lynch, Devine and Clark, JJ., concur.

ORDERED that the judgment is modified, on the facts, by reversing defendant's convictions of murder in the second degree and manslaughter in the first degree under counts 1 and 2 of the indictment; said counts dismissed and the sentences imposed thereon vacated; and, as so modified, affirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court