People v Stover (2019 NY Slip Op 08734)





People v Stover


2019 NY Slip Op 08734


Decided on December 5, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 5, 2019

109688

[*1]The People of the State of New York, Respondent,
v
Raekwon Stover, Appellant.

Calendar Date: October 18, 2019

Before: Egan Jr., J.P., Lynch, Clark and Pritzker, JJ.


Paul J. Connolly, Delmar, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the County Court of Schenectady County (Sira, J.), rendered August 8, 2017, upon a verdict convicting defendant of the crimes of murder in the second degree, criminal possession of a weapon in the second degree (two counts) and tampering with physical evidence (two counts).
On September 15, 2016, defendant, age 19, entered the home of the victim, age 17, and shot her in the head. An investigation revealed that defendant had been coordinating and profiting from the victim's activities as a prostitute and, in the month prior to her death, the victim had missed "dates," which caused arguments between defendant and the victim. After a week-long jury trial, defendant was convicted of one count of murder in the second degree (count 1), two counts of criminal possession of a weapon in the second degree (counts 3 and 4) and two counts of tampering with physical evidence (counts 5 and 6). After County Court denied defendant's motion pursuant to CPL 330.30, defendant was sentenced to a prison term of 25 years to life for his conviction of murder in the second degree, as well as lesser concurrent and consecutive prison terms for his other convictions. Defendant appeals, and we affirm.
Defendant argues that the jury verdict is not supported by legally sufficient evidence and is against the weight of the evidence.[FN1] "In conducting a legal sufficiency analysis, this Court views the evidence in the light most favorable to the People and evaluates whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirement for every element of the crime charged" (People v Brousseau, 149 AD3d 1275, 1276 [2017] [internal quotation marks, brackets and citations omitted]; see People v Lamont, 25 NY3d 315, 318 [2015]). "A weight of the evidence review requires this Court to first determine whether, based on all the credible evidence, a different finding would not have been unreasonable. Where a different finding would not have been unreasonable, [this Court] must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Taft, 145 AD3d 1090, 1091-1092 [2016] [internal quotation marks, brackets and citations omitted], lv denied 29 NY3d 953 [2017]; see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Rizvi, 126 AD3d 1172, 1175 [2015], lv denied 25 NY3d 1076 [2015]).
As relevant here, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law 125.25 [1]). A person is guilty of criminal possession of a weapon in the second degree when, "with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm" (Penal Law § 265.03 [1] [b]). A person is also guilty of criminal possession of a weapon when "such person . . . possesses any loaded firearm" (Penal Law § 265.03 [3]). "A person is guilty of tampering with physical evidence when, "[b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he [or she] suppresses it by any act of concealment, alteration or destruction" (Penal Law § 215.40 [2]).
The victim's mother (hereinafter the mother) testified to the events of the night that the victim was murdered. She explained that she was at her apartment when the victim came home between 10:00 p.m. and 11:00 p.m. and ate spaghetti before going to her room. While the mother was in bed, she heard a knock on the apartment door. She asked who was at the door and a voice responded by asking for the victim, at which time the mother called out to the victim to answer the door. The mother and the victim met in the hallway and the mother returned to her bedroom. The mother explained that she was in bed, "nodding off," when she heard a gunshot. The mother immediately went to the victim's bedroom and saw defendant standing over the victim.[FN2] The mother immediately left the bedroom, retrieved her cell phone and called 911. While the mother was on the front porch speaking with 911, she saw defendant "busting out" of a nearby residence and running away. The mother testified that, in the two months preceding the incident, she had seen defendant at her house with the victim approximately five times. The mother's boyfriend testified that he was woken up from a deep sleep when the mother screamed, "They killed my baby." He explained that he went to the victim's bedroom and saw the victim lying on her back on a mattress in a pool of blood. He also stated that he believed the victim was "seeing" defendant because he had been at the house a couple of times. A next-door neighbor, who was friends with the victim, testified that, at approximately 11:00 p.m., she was at home asleep in her bedroom and that she woke up when she heard the victim scream for her mother and then heard a gunshot "less than a second" later. She explained that the victim's voice was loud and sounded scared.
Andrew Dannible, an officer with the City of Schenectady Police Department, testified that he was the first officer at the scene and that, when he went into the back bedroom in the apartment, he found the victim lying on the bed with a gunshot wound to her head. He testified that paramedics arrived at the scene shortly after and pronounced her dead. Christopher North, a detective and crime scene investigator with the City of Schenectady Police Department, testified that, after photographing the scene, he checked the area for physical evidence. North testified that he photographed, among other things, a bloody hand smear on the wall next to the victim's body and four live bullets found in the bedroom where the victim was located. North testified that, after the victim was removed from the room, he found two cell phones underneath her body. William Martin, an investigator with the State Police, testified that he performed extractions on the two cell phones that revealed multiple conversations between the victim and defendant. Martin testified that several text messages contained in the victim's phone referenced prostitution, and that the Internet history revealed that the phone had been used to access a website called Backpage, which is used for prostitution. Martin also testified that several different email accounts associated with defendant were registered at Backpage. Michael Sikirica, a medical examiner, testified that he performed an autopsy of the victim and ultimately concluded that her cause of death was brain injuries due to a gunshot wound to the head. He further concluded, within a reasonable degree of medical certainty, that the manner of her death was homicide.
Several witnesses testified to events that occurred earlier in the evening of the victim's murder, including the victim's sister who testified that the victim was at her house at approximately 5:00 p.m. and that she was texting defendant. The sister's neighbor testified that he had met the victim prior to the night of her murder. He explained that the night of her murder he heard male and female voices outside of his apartment and that, when he looked to see who it was, he saw the victim arguing with a young, light-skinned male with braids in his hair. The sister's neighbor testified that he had seen him before with the victim. Clay Descesare testified that he used Backpage to meet up with girls for casual sexual encounters, and that he responded to an ad to meet up with a woman, whom he later learned was the victim, the night of her murder. However, after texting and calling the number associated with the victim to attempt to hire her as a prostitute, she never returned his messages or calls.
Abi Bashton, the mother of one of defendant's children, also testified at trial. Bashton testified that she lived down the street from the victim and that, on the night of the murder, she had been working and returned home around 10:40 p.m. Defendant was at her house when she arrived home and left "[t]o get bullets" approximately 10 to 15 minutes after she got home. Bashton stated that defendant did not come back to her house that evening and that, shortly after he left, she went up the street to the victim's house, where she heard the mother screaming. She left shortly after and was stopped by an officer, who briefly spoke with her. Bashton testified that, after she spoke with the officer, she texted her brother and told him to get all of defendant's things out of her room. Bashton's brother testified at trial that, after Bashton called him, he retrieved an "all black corner store bag" from Bashton's room. He testified that the bag belonged to defendant and contained a box of bullets, which he threw in his "baby mother's neighbor's yard." He testified that he did not see the bag again until he showed it to the police prior to trial and that, when he showed it to the police, it was in the same location where he originally threw it.[FN3] Bashton explained that she knew the victim through defendant, that defendant and the victim were involved with one another and that, about a week before the murder, defendant came to Bashton's house and told her that he had seen the victim with her "baby father with no pants on." Bashton also testified that, during the summer of 2016, defendant was making money by "pimping" the victim.
Bashton further testified that, the day after the murder, defendant came to see her at work and told her that shooting the victim was an accident that happened while he was cleaning his gun. Gregory Stover, defendant's father, testified that he met the victim once when she came to his house with defendant and that he learned from Bashton that the victim had been murdered. Stover testified that, two days after the murder, he had a conversation with defendant, who told him that he and the victim "were horseplaying and the gun went off." Stover further stated that defendant told him that, when the gun went off, it was in defendant's hand and that the bullet hit the victim. Defendant also told Stover that he left the victim's residence, ran up the street and tossed the gun. Stover also testified that, after speaking to defendant, he took him to the police station where defendant was arrested. When defendant was booked at the jail after his arrest, the police seized his white sneakers, which were later tested by forensic investigators with the State Police. Testimony at trial revealed that a swab taken from blood on defendant's sneaker matched the DNA sample from the victim. Antonia Garcia, the mother of two of defendant's children, testified that, during the summer of 2016, defendant told her that he was going to make extra money by "pimping." She further testified that she had seen defendant carry and clean a gun, but that she had never seen defendant fool around or "horseplay" with it. She also stated that, three days after the murder, defendant called her while he was in jail and asked her to delete "stuff off his e[]mail." Garcia explained that she assumed defendant meant pictures that he had on his computer of him with the victim in lingerie. She testified that she deleted the pictures for him.
Joseph Lewis testified that he met the victim in December 2014 and they became "best friends." Lewis stated that he was also friends with defendant and that, when defendant moved to the same street where the victim lived, Lewis asked him to check up on her. Lewis testified that he was in the Schenectady County Jail for a few hours in December 2016 and that, when he was there, he saw defendant in intake. When Lewis asked defendant what happened to the victim, defendant told him that he had been "pimping" her and that defendant had set her up with someone, but that she told defendant she was busy "cooking spaghetti." Lewis explained that defendant said that he thought the victim was blowing him off, so defendant went to her house and they argued. Lewis testified that he asked defendant what happened next; initially, defendant told him that the gun accidentally went off, but then defendant told him that he shot and killed the victim. Lewis also testified that he is currently serving a prison term for selling drugs and that he was promised time off of his sentence if he testified truthfully. Lewis described that, the night before his testimony, three men approached him in the jail because they knew he was testifying and told him that they did not want him to testify. Lewis explained that, when he told the men that he did not know what they were talking about, they jumped him and gave him a black eye.
We turn first to the sufficiency of the evidence as to defendant's conviction for murder in the second degree (count 1). Inasmuch as at least three witnesses confirmed that defendant told them he shot the victim, it was clear that defendant was angry at the victim, and his intent to kill the victim may be inferred from his actions, the People established the necessary elements for this conviction (see People v Reese, 166 AD3d 1057, 1058 [2018], lv denied 33 NY3d 953 [2019]; People Broadnax, 52 AD3d 1306, 1307 [2008], lv denied 11 NY3d 830 [2008]). Further, the evidence clearly confirmed that defendant possessed and used an operable gun to fatally shoot the victim, establishing the elements necessary for a conviction of criminal possession of a weapon in the second degree (count 3) (see People v Mathews, 134 AD3d 1248, 1250 [2015]). Finally, as to his conviction of tampering with physical evidence (count 6), although Garcia only inferred that the images that defendant wanted her to delete were the ones of the victim in lingerie, "viewing the evidence in the light most favorable to the People, there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Thompson, 75 AD3d 760, 762 [2010] [internal quotation marks and citations omitted], lvs denied 15 NY3d 893, 894, 896 [2010]; see People v Wilkins, 111 AD3d 451, 451 [2013], lv denied 23 NY3d 1044 [2014]). In addition, viewing the evidence in a neutral light and deferring to the jury's resolution of issues of credibility, we find that the convictions are not against the weight of the evidence (see People v Chaneyfield, 157 AD3d 996, 1000 [2018], lv denied 31 NY3d 1012 [2018]; People v Din, 110 AD3d 1246, 1247-1248 [2013], lv denied 22 NY3d 1137 [2014]).[FN4]
Nor do we find merit in defendant's contention that various evidentiary rulings deprived him of a fair trial. First, County Court did not err in admitting three photographs that defendant refers to as "gruesome." The photographs at issue depict the victim's bedroom in the aftermath of the shooting, including the bleeding victim lying on bloody bedding. Although we cannot dispute that these photographs are unpleasant to view, they showed the jury the position of the victim's body and the nature of her injuries in a way that the other photos were unable to do and, as such, were probative of material issues at trial, including that defendant intended to kill the victim (see People v Greenfield, 167 AD3d 1060, 1063 [2018], lv denied 32 NY3d 1204 [2019]; People v Thibeault, 73 AD3d 1237, 1243 [2010], lv denied 15 NY3d 810 [2010], cert denied 562 US 1293 [2011]). Therefore, because the photographs were probative and were not admitted "for the sole purpose of arousing the emotions of the jury and to prejudice defendant," we find no abuse of discretion in County Court's admission of these photos (People v Greenfield, 167 AD3d at 1063 [internal quotation marks, brackets and citations omitted]). Defendant also contends that County Court erred in permitting Stover to testify regarding statements that defendant made to him, as those statements violate the parent-child privilege. A parent-child privilege may arise "when a minor, under arrest for a serious crime, seeks the guidance and advice of a parent in the unfriendly environs of a police precinct" (People v Harrell, 87 AD2d 21, 26 [1982], affd 59 NY2d 620 [1983]; see People v Edwards, 135 AD2d 556, 557 [1987], lvs denied 71 NY2d 968, 72 NY2d 918 [1988]). Here, the privilege would not apply, as defendant was 19 years old at the time of the conversation with Stover (see People v Johnson, 84 NY2d 956, 957 [1994]; People v Edwards, 135 AD2d at 557). Defendant's remaining challenges to evidentiary rulings, including the admission of part of the 911 phone call made by the mother wherein she states "he killed my baby" and Lewis' testimony that he was assaulted in the jail are unpreserved for our review (see People v Pascuzzi, 173 AD3d 1367, 1375 [2019], lv denied 34 NY3d 953 [2019]; People v Pearson, 151 AD3d 1455, 1458 [2017], lv denied 30 NY3d 982 [2017]; People v Abrams, 73 AD3d 1225, 1227-1228 [2010], affd 17 NY3d 760 [2011]).
We are similarly unpersuaded by defendant's assertion that County Court erred in denying his request for a circumstantial evidence charge. At trial, defendant requested a circumstantial evidence charge as to counts 1, 3, 5 and 6, asserting that the testimony of Stover, Bashton and Lewis did not constitute direct evidence that he had the intent to commit any of those crimes. "It is well settled that a trial court must grant a defendant's request for a circumstantial evidence charge when the proof of the defendant's guilt rests solely on circumstantial evidence. By contrast, where there is both direct and circumstantial evidence of the defendant's guilt, such a charge need not be given" (People v Hardy, 26 NY3d 245, 249 [2015] [citations omitted]; accord People v James, 147 AD3d 1211, 1212 [2017], lv denied 29 NY3d 1128 [2017]). Here, County Court gave an evidentiary inference charge "and, therefore, this is not a case where the trial court simply outright refused to grant any circumstantial evidence charge at all" (People v James, 147 AD3d at 1214). Moreover, defendant's claim, as to murder in the second degree, that a circumstantial evidence charge is necessary is without merit, because "there was both direct and circumstantial evidence of defendant's guilt, notwithstanding that defendant's intent was a matter to be inferred from the evidence" (People v Hull, 125 AD3d 1099, 1101 [2015] [internal quotation marks and citation omitted], lv denied 27 NY3d 1056 [2016]; see People v Daddona, 81 NY2d 990, 992-993 [1993]). For the same reasons, we discern no error in the court's refusal to give a circumstantial evidence charge as to counts 3, 5 and 6 (see People v Ash, 162 AD3d 1318, 1322 [2018], lv denied 32 NY3d 1002 [2018]; People v Daddona, 81 NY2d at 992-993).
Defendant asserts that County Court violated CPL 310.20 by including annotations on the second verdict sheet provided to the jury. Pursuant to CPL 310.20 (2), "[u]pon retiring to deliberate, the jurors may take with them [a] written list prepared by the court containing the offenses submitted to the jury by the court in its charge and the possible verdicts thereon. Whenever the court submits two or more counts charging offenses set forth in the same article of the law, the court may set forth the dates, names of complainants or specific statutory language, without defining the terms, by which the counts may be distinguished; provided, however, that the court shall instruct the jury in its charge that the sole purpose of the notations is to distinguish between the counts" (see People v Vandebogart, 158 AD3d 976, 979 [2018], lv denied 31 NY3d 1089 [2018]; People v McCloud, 121 AD3d 1286, 1289-1290 [2014], lv denied 25 NY3d 1167 [2015]). The Court of Appeals has "held that it is reversible error, not subject to harmless error analysis, to provide a jury in a criminal case with a verdict sheet that contains annotations not authorized by CPL 310.20 (2)" (People v Miller, 18 NY3d 704, 706 [2012]; see People v Worthington, 150 AD3d 1399, 1400 [2017], lv denied 29 NY3d 1095 [2017]). Moreover, "[t]he basic principle is that nothing of substance can be included that the statute does not authorize" (People v Worthington, 150 AD3d at 1400 [internal quotation marks, brackets and citation omitted]).
Here, during the charge conference, the form and content of the verdict sheet was discussed and agreed upon, including a statement at the end that stated that defendant had reviewed the verdict sheet with his attorney and approved the form and content. County Court informed defendant that neither the statement nor defendant's signature would be included on the copy being provided to the jury. When the jury first returned a verdict, the jury erroneously included lesser included charges for counts 1 and 3. To remedy this error, County Court, with the agreement of both parties, instructed the jury regarding how to properly mark the verdict sheet, provided the jury with a new verdict sheet and instructed the jury to resume deliberations consistent with the court's instructions. After the jury came back and rendered the new verdict, defendant became aware that the second verdict sheet had the statement that defendant reviewed and approved it, but it did not have defendant's signature. The extraneous statement was not part of the questions posed to the jury; rather, it was at the end of the verdict sheet. It did not change any of the questions to the jury. Based on the foregoing, we find that the submission to the jury of the second verdict sheet with the statement asserting that defendant authorized it, without his signature, was not reversible error, because the extraneous statement gave no substantive information to the jury about the case and merely indicated that defendant saw the verdict sheet, was aware of his charges and was represented by an attorney (see CPL 310.20 [2]; People v Miller, 18 NY3d at 707-710; People v Worthington, 150 AD3d at 1400).
Defendant next contends that he received ineffective assistance of counsel because his attorney failed to object to the admission of exhibit No. 66 — an "unduly gruesome photo" — and failed to preserve defendant's challenge to Lewis' testimony regarding the jail assault. In general, "[i]n order to sustain a claim of ineffective assistance of counsel, a court must consider whether defense counsel's actions at trial constituted egregious and prejudicial error such that the defendant did not receive a fair trial. A claim will fail so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation" (People v Criss, 151 AD3d 1275, 1280 [2017] [internal quotation marks, brackets and citations omitted], lv denied 30 NY3d 979 [2017]; see People v Roshia, 133 AD3d 1029, 1031 [2015], affd 28 NY3d 989 [2016]). With respect to counsel's failure to object to the admission of exhibit No. 66, because defense counsel objected to four other photographs that he deemed to be unduly gruesome, and three of the four of those photographs were still admitted, this alone is not tantamount to ineffective assistance of counsel (see People v Chancey, 127 AD3d 1409, 1412-1413 [2015], lv denied 25 NY3d 1199 [2015]). As to defense counsel's alleged failure to preserve defendant's challenge to Lewis' testimony regarding the jail assault, "failure to object to this harmless error, without more, 'was not so serious as to compromise defendant's right to a fair trial' and did not constitute ineffective assistance" (People v Every, 146 AD3d 1157, 1165-1166 [2017], affd 29 NY3d 1103 [2017], quoting People v Gunney, 13 AD3d 980, 983 [2004], lv denied 5 NY3d 789 [2005]). Moreover, because a review of the record reveals that defense counsel made appropriate objections, effectively participated in cross-examination and made a cogent closing argument, we find that defendant received the effective assistance of counsel (see People v Flower, 173 AD3d 1449, 1457 [2019], lv denied 34 NY3d 931 [2019]; People v Lancaster, 143 AD3d 1046, 1052 [2016], lv denied 28 NY3d 1147 [2017]). Finally, notwithstanding defendant's young age of 20 at the time of sentencing, we do not agree with defendant that his sentence was harsh and excessive, given, among other things, the abhorrent nature of defendant's crimes (see People v Vega, 170 AD3d 1266, 1274 [2019], lv denied 33 NY3d 1074 [2019]; People v Collier, 146 AD3d 1146, 1152 [2017], lv denied 30 NY3d 948 [2017]).
Egan Jr., J.P., Lynch and Clark, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Defendant's challenge to the legal sufficiency of counts 4 and 5 is unpreserved for our review as defendant did not make specific arguments regarding those counts in his motion for a trial order of dismissal (see People v McCoy, 169 AD3d 1260, 1261 [2019], lv denied 33 NY3d 1033 [2019]). Nevertheless, in the course of reviewing defendant's challenge that the verdict as to all counts is against the weight of the evidence, we "necessarily evaluate whether all elements of the charged crimes were proven beyond a reasonable doubt" (id.).

Footnote 2: The mother described defendant as a male with a light complexion, two braids in his hair and wearing white sneakers.

Footnote 3: This testimony was corroborated by a detective with the City of Schenectady Police Department who testified about assisting in the retrieval of the black bag.

Footnote 4: Inasmuch as all of defendant's convictions were "not against the weight of the evidence presented at trial, [they were] necessarily founded upon legally sufficient evidence as well. As such, defendant's challenges to the grand jury proceeding are precluded to the extent they involve the sufficiency of the evidence presented or the instructions given to the grand jury" (People v Gaston, 147 AD3d 1219, 1220 n 2 [2017] [citations omitted]). "Our review of the minutes does not reveal any other errors in presenting the case to the grand jury that impaired the integrity of the proceeding or caused prejudice to defendant so as to warrant the drastic remedy of reversal" (People v Flower, 173 AD3d 1449, 1454 n [2019] [internal quotations marks and citations omitted], lv denied 34 NY3d 931 [2019]).