People v Anderson (2018 NY Slip Op 02105)





People v Anderson


2018 NY Slip Op 02105


Decided on March 23, 2018


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 23, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CARNI, J.P., LINDLEY, DEJOSEPH, TROUTMAN, AND WINSLOW, JJ.


1250 KA 14-00474

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
TAJH ANDERSON, DEFENDANT-APPELLANT. 






WILLIAM G. PIXLEY, PITTSFORD, FOR DEFENDANT-APPELLANT. 
SANDRA DOORLEY, DISTRICT ATTORNEY, ROCHESTER (LEAH MERVINE OF COUNSEL), FOR RESPONDENT. 


 Appeal from a judgment of the Monroe County Court (Victoria M. Argento, J.), rendered September 19, 2013. The judgment convicted defendant, upon a jury verdict, of murder in the second degree. 
It is hereby ORDERED that the judgment so appealed from is affirmed.
Memorandum: On appeal from a judgment convicting him upon a jury verdict of murder in the second degree (Penal Law § 125.25 [1]), defendant contends that he was denied a fair trial by the admission of prejudicial propensity evidence, and that his waiver of the right to be present at trial was invalid because County Court did not investigate whether he was receiving a proper dosage of psychiatric medication. We affirm the judgment of conviction.
In 2005, the 15-year-old victim was shot to death near the Campbell Street Recreation Center in Rochester with a 9 millimeter semiautomatic weapon. On the evening of the murder, the police questioned but did not charge defendant, who was then 14 years old. The case went cold until 2011, when defendant made admissions about the murder to another inmate (informant) while he was incarcerated on unrelated charges. Defendant's admissions to the crime were contained in a handwritten letter, which defendant showed to the informant before mailing it to the mother of his child. After the informant reported defendant's admissions to the authorities, investigators outfitted him with a wire to record future conversations with defendant. Defendant made further admissions in audio-recorded conversations with the informant.
Defendant was indicted for the 2005 murder and, at trial, the People sought to admit the letter in evidence. Defense counsel requested the redaction of certain information, and the court granted counsel's request in part. After the letter was redacted to omit references to unrelated charges that were pending against defendant at the time he wrote it, the court received it in evidence. The letter was read aloud to the jury by the mother of defendant's child, who testified that she received it and recognized the handwriting as defendant's. In the letter, defendant wrote, inter alia, that he "first shot somebody" on Campbell Street when he was 14 years old, that wiser persons were "always" telling him to calm down or he would "end up killin' somebody," that he "let a lot of people live," and that he was hopeful that he would not get killed or "kill somebody" in prison. The letter further read, "It's like sometimes I turn into the Devil in true form," and "I am a wolf, tiger, bear, bull, lion, shark, . . . I'm a [ ] beast. I never had fear pump in my soul or heart."
The court also admitted in evidence audio recordings of defendant's conversations with the informant. In one recording, defendant admitted to the crime charged and also claimed to be responsible for an unrelated shooting with a "deuce-deuce rifle," which he described as his "favorite shot." Defendant spoke knowledgeably about different makes and models of guns, none of which had been used to commit the crime charged, and the two men discussed the best ways to shoot different guns. Defendant also spoke of various crimes that had been committed [*2]by members of his family, and told the informant that guns had been available to him since he was 14 years old. Defendant said that he had no regard for feelings, and he and the informant mimicked the sounds of gunfire.
As a preliminary matter, defendant correctly concedes that he did not object to the admission of the alleged propensity evidence at issue on appeal and thus failed to preserve for our review his contention that the court erred in admitting that evidence (see CPL 470.05 [2]; People v Chase, 277 AD2d 1045, 1045 [4th Dept 2000], lv denied 96 NY2d 733 [2001]). We decline to exercise our power to review that contention as a matter of our discretion in the interest of justice (see CPL 470.15 [6] [a]).
We conclude, contrary to the view of our dissenting colleagues, that defendant received effective assistance of counsel. It is well settled that "a reviewing court must avoid confusing true ineffectiveness with mere losing tactics' " (People v Benevento, 91 NY2d 708, 712 [1998]). It "is not for [the] court to second-guess whether a course chosen by defendant's counsel was the best trial strategy, or even a good one, so long as defendant was afforded meaningful representation" (People v Satterfield, 66 NY2d 796, 799-800 [1985]). Crucially, we note that the evidence in question is the very same evidence upon which defendant relied to establish his defense at trial. The defense theory of the case, as articulated in defense counsel's summation, was that defendant did not kill the victim; he was merely "talking tough" because he was afraid of being in jail. Indeed, as defendant told the investigators, he was just "trying to sound bigger than he really was." Defense counsel urged the jury to find defendant's statements unworthy of belief because defendant was frightened and "puffing." In an effort to deflect the jury's attention from defendant's admissions to the charged crime, defense counsel made a deliberate choice, as a matter of trial strategy, to leave those admissions in the context of the gratuitous boasting in which they arose. Although the evidence in question would have been excludable upon a motion by defendant, we conclude that the evidence was consistent with the defense strategy. Moreover, the redaction of such material from the letter and audio recording would have highlighted defendant's confession to the Campbell Street homicide. In other words, extracting defendant's admissions from the extraneous talk that was consistent with the puffing defense would have undercut the defense theory and focused the jury's attention on defendant's admissions of guilt.
We are mindful that counsel was tasked with providing a cogent defense notwithstanding defendant's repeated and recorded admissions of guilt, which would ultimately be presented to the jury regardless of whether the other material was redacted. As a result, counsel was in the unenviable position of having to convince the jury that defendant's admissions were unworthy of belief. To that end, it was favorable to the defense for the jurors to observe for themselves the extent to which defendant was a tough-talker. Otherwise, the defense theory that defendant was "puffing" and "trying to sound bigger than he really was" would have had no corroboration in the trial record. Moreover, counsel presented a clear and effective opening statement, a blistering cross-examination of the informant, and a powerful summation on defendant's behalf. We conclude that he provided defendant with meaningful representation (see generally People v Baldi, 54 NY2d 137, 147 [1981]), and that defendant was afforded a fair trial.
Finally, we reject defendant's contention that his waiver of the right to be present at trial was not knowingly, intelligently, and voluntarily made. There were no concerns raised about defendant's mental health as the trial date approached, or in the first several days of the trial. The court had the opportunity to observe defendant's behavior as the trial proceeded, and the court observed that he was actively assisting his attorney and behaving "like a gentleman." Notably, defendant's request to absent himself from the trial came after he attentively sat through jury selection, opening statements, and the testimony of 10 prosecution witnesses. It was only after defendant's childhood friend offered damaging testimony against defendant that he indicated that he no longer wished to be present in the courtroom. At that time, the court conducted a careful inquiry and defendant responded in a lucid and unambiguous manner. Defendant convincingly established that he understood the consequences of his decision. Thus, we conclude that defendant knowingly, intelligently, and voluntarily waived his right to be present at trial (see People v Parker, 57 NY2d 136, 140-141 [1982]).
All concur except Lindley and Troutman, JJ., who dissent and vote to reverse in accordance with the following memorandum: We respectfully dissent. We agree with the majority concerning the waiver of the right to be present. In our view, however, defendant was [*3]denied a fair trial by the admission of egregious and prejudicial propensity evidence, and was also denied effective assistance of counsel by his attorney's failure to seek appropriate redaction of that evidence. Therefore, we would reverse the judgment and grant defendant a new trial.
The victim was killed in 2005 near the Campbell Street Recreation Center by the use of a 9 millimeter semiautomatic weapon. Defendant was 14 years old when the crime occurred. The police questioned him that same night, but he was not charged. The case went cold. Years later, defendant was jailed on unrelated charges. While in jail, he showed an inmate a letter that he had written to the mother of his child. The inmate reported that letter to the authorities and agreed to work as a jailhouse informant. Investigators outfitted him with a wire to record future conversations with defendant. The investigation resulted in defendant's indictment on the charge of murder.
The People sought to admit a redacted version of the letter in evidence at trial. References to the unrelated charges were redacted, but little else was. Defense counsel moved to redact repeated references to defendant's self-applied alias, "Shotz," but County Court ruled that all of those references should remain in the letter as evidence of authorship. Authorship was never genuinely in dispute. Defense counsel could have proposed to stipulate to authorship if the People agreed to redact defendant's prejudicial alias, but he inexplicably failed to do so. Defense counsel also failed to object to additional propensity evidence contained in the letter. Consequently, the jury listened as the mother of defendant's child read that defendant "first shot somebody" on Campbell Street when he was 14 years old, suggesting that he had committed this crime and other unrelated shootings as well. He wrote that he "let a lot of people live," suggesting that he believed that he held the power of life and death over others. Defendant recalled that others were "always" telling him to calm down or he would "end up killin' somebody," and he expressed hope that he would not "kill somebody" in prison. "It's like sometimes I turn into the Devil in true form," defendant wrote, "a wolf, tiger, bear, bull, lion, shark, . . . [a] beast."
Furthermore, although the letter was redacted to remove references to the unrelated charges, defense counsel failed to object to an additional reference to a witness who was "about to take the stand" against him in that other case. That witness did not testify at this trial, suggesting that there was additional damaging evidence that the jury had not heard.
The People also sought to admit audio recordings of conversations between defendant and the jailhouse informant. In one of those recordings, defendant admitted to the crime charged at the outset. The recording could have been played for the jury only until that point, but the People played the rest of the conversation for the jury without objection from defense counsel. Thus, the jury heard defendant claim that he had committed an unrelated shooting near a police station using a "deuce deuce" rifle, which defendant called his "favorite" gun. Indeed, defendant spoke knowledgeably about many different brands and styles of guns, none of which had been used in the crime charged. He claimed that such guns had been available to him since he was 14 years old, and he explained how to shoot them, even correcting the jailhouse informant on technical points. Midway through the conversation, defendant and the informant mimicked the sound of gunfire, apparently enjoying the subject matter. Defendant also discussed deplorable crimes that were committed by family members. In particular, one of his brothers "shot up" a car, and another brother punched his child's grandmother in the face.
It is longstanding judicial policy that evidence of uncharged crimes or prior bad acts is inadmissible if its only conceivable relevance is to the defendant's bad character or criminal propensity (see People v Leonard, 29 NY3d 1, 6 [2017]; People v Molineux, 168 NY 264, 313-314 [1901]). Such evidence is inherently prejudicial because "it may induce the jury to base a finding of guilt on collateral matters or to convict a defendant because of his past" (People v Alvino, 71 NY2d 233, 241 [1987]; see People v Arafet, 13 NY3d 460, 465 [2009]). It is well recognized that " [t]he natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge' " (People v Cass, 18 NY3d 553, 559 [2012]; see People v Zackowitz, 254 NY 192, 198 [1930]).
There can be no doubt that the propensity evidence contained in the letter and audio [*4]recording was inadmissible and that the court would have committed reversible error had it admitted the evidence over defendant's objection. Indeed, the People on appeal do not even assert that the propensity evidence admitted against defendant was admissible. Instead, they point out that defendant failed to object to the evidence and contend that we should not address his contention in the interest of justice because the evidence was not so prejudicial as to deprive him of a fair trial. The majority agrees with the People, but we do not. In our view, the propensity evidence was highly prejudicial and inadmissible (see People v Mhina, 110 AD3d 1445, 1446-1447 [4th Dept 2013]), and the proof of guilt was by no means overwhelming considering that this was a cold case murder investigation with no eyewitnesses (see generally People v Crimmins, 36 NY2d 230, 241-242 [1975]). We would exercise our power to review as a matter of discretion in the interest of justice defendant's contention concerning the inadmissibility of the propensity evidence (see CPL 470.15 [6] [a]), reverse the judgment, and grant defendant a new trial.
In any event, defendant contends that he received ineffective assistance of counsel due to his attorney's failure to object to the propensity evidence, a contention that need not be preserved. We agree. Every defendant has a right to effective assistance of counsel guaranteed by the federal and state constitutions (see US Const 6th Amend; NY Const, art I, § 6; People v Baldi, 54 NY2d 137, 146 [1981]). That right "is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial in an adversarial system of justice" (People v Benevento, 91 NY2d 708, 711 [1998] [internal quotation marks omitted]; see People v Claudio, 83 NY2d 76, 80 [1993], rearg dismissed 88 NY2d 1007 [1996]). Thus, to establish that counsel was ineffective, the defendant must demonstrate that "he or she did not receive a fair trial because counsel's conduct was egregious and prejudicial' " (People v Ambers, 26 NY3d 313, 317 [2015], quoting People v Oathout, 21 NY3d 127, 131 [2013]). It is also necessary that the defendant "demonstrate the absence of strategic or other legitimate explanations" to rebut the presumption that "counsel acted in a competent manner and exercised professional judgment" (People v Rivera, 71 NY2d 705, 709 [1988]; see Benevento, 91 NY2d at 712).
In evaluating defendant's contention, we must "avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis" (Baldi, 54 NY2d at 146; see Benevento, 91 NY2d at 712). Although our analysis is focused on " the fairness of the process as a whole' " (People v Wright, 25 NY3d 769, 779 [2015]; see People v Clark, 28 NY3d 556, 563 [2016]), even a single failing in an otherwise competent performance may be "so egregious and prejudicial' as to deprive a defendant of his [or her] constitutional right" (People v Turner, 5 NY3d 476, 480 [2005], quoting People v Caban, 5 NY3d 143, 152 [2005]).
The majority asserts that "defense counsel made a deliberate choice, as a matter of trial strategy, to [allow the jury to hear the propensity evidence] in the context of the gratuitous boasting in which they arose." The majority cannot be sure that this was defense counsel's strategy. Rather, the majority's conclusion is based on conjecture. We note that the People in their brief do not even suggest that this was defense counsel's strategy. Defense counsel's opening statement does not suggest that this was his strategy. To the extent that his summation referenced the propensity evidence, defense counsel's belated attempt to address highly prejudicial propensity evidence that was erroneously admitted at an earlier stage of trial does not indicate that it had been his strategy all along. We submit that any reliance on defense counsel's summation to establish that it had been his strategy to allow the evidence would give undue significance to retrospective analysis.
Regardless, even if defense counsel's strategy involved intentionally failing to object to the highly prejudicial propensity evidence, we conclude that it was not a reasonable strategy. The evidence of defendant's prior bad acts and his criminal propensity painted him as nothing other than a cold-blooded killer. Defendant, going by the self-applied alias "Shotz," intimated that he had committed numerous shootings, and gave specifics about an unrelated shooting near a police station where he used his "favorite" gun, the "deuce deuce" rifle. Not only did defendant discuss having killed people, but he also expressed that others had observed his tendency toward homicidal behavior, and he engaged in a lengthy discussion with the informant about his prolific use of guns. The majority asserts that "redaction of such material from the letter and audio recording would have highlighted defendant's confession" and undermined the defense. We [*5]respectfully submit that juries do not deliberate in that manner, as the courts recognize in Molineux and its progeny. If history is any guide, the propensity evidence more likely led the jury to conclude that, even if defendant was being untruthful about having killed someone at the early age of 14, he had almost certainly killed someone in the intervening years and therefore deserved to be imprisoned for murder in this case.
The challenged evidence was unnecessary to establish that defendant's disclosures were untruthful and that he was merely bragging. Counsel certainly could have presented such a defense without allowing an avalanche of prejudicial propensity evidence before the jury. The evidence was not only unnecessary; it undoubtedly undermined his defense. The extensive, detailed, and highly prejudicial discussion of guns between defendant and the jailhouse informant established that defendant was not merely bragging about using guns, but in fact had in-depth knowledge of guns and experience using them. There was no legitimate excuse for counsel's failure to object to that evidence. Furthermore, some of the objectionable portions of the letter and audio recording bore no conceivable relation to the defense whatsoever. The reference to another witness who had supposedly agreed to testify against him in another case did nothing to advance the defense. Nor did the references to crimes of defendant's family members, which might have suggested to the jury that he came from "bad stock" and belongs in prison. Nor did the reference to anticipated, unspecified testimony from a nonexistent witness.
Under the circumstances, we conclude that defense counsel's failings deprived defendant of effective assistance of counsel (see Wright, 25 NY3d at 780). We would therefore reverse the judgment and grant defendant a new trial on that ground as well.
Entered: March 23, 2018
Mark W. Bennett
Clerk of the Court